JOHNSON *v.* JOHNSON.

## Opinion delivered June 30, 1924.

1. DIVORCE—EVIDENCE.—A finding that defendant was not guilty of adultery *held* supported by the weight of evidence.

2. DIVORCE—AMOUNT OF ALIMONY.—The amount to be allowed as alimony is within the sound discretion of the trial court, and all circumstances should be considered in fixing it, such as the husband's ability to pay, the station in life of the parties, and the conduct of the wife bearing upon the cause of separation.

3. DIVORCE—AMOUNT OF ALIMONY.—Where a wife's persistent association with immoral characters was largely responsible for the separation of the parties, an allowance to her as alimony of $250 per month will be reduced to $150 per month.

Appeal from Garland Chancery Court; *J. P. Henderson,* Chancellor; modified.

*Martin, Wootton & Martin,* for appellant.

Adultery need not be established by direct evidence, the law merely requires proof by circumstantial or inferential evidence. 143 Ark. 277; 101 Ark. 522; Schouler on Marriage and Divorce, p. 1794; 19 Corpus Juris, p. 129. The difficulty of proving adultery is well recognized in the law of divorce. Abbott's Trial Evidence, pp. 2033-3042; Encyclopedia of Evidence, vol. 1, p. 628; 2 Bishop on Marriage and Divorce, § 1353. In proving adultery on the part of the wife it is only necessary to prove a lascivious disposition toward her paramour and a favorable opportunity for its exercise. 19 Corpus Juris 129; 143 Ark. 277; Schouler on Marriage and Divorce, p. 1794. Wilful and continued association with a man of known immoral character in reference to his relations with women is in itself evidence of adultery and sufficient ground for divorce. Abbott's Trial Evidence, pp. 2033, 2044; 19 Corpus Juris 129.

*Murphy, McHaney & Dunaway* and *Murphy & Wood,* for appellee.

HUMPHREYS, J. On the 11th day of April, 1922, appellant instituted suit against his wife, the appellee, in the chancery court of Garland County for an absolute divorce upon the ground of indignities, and, on the 5th

day of May following, filed an amendment to his bill, charging her with having committed adultery with one Elmer Walters on the night of March 28, 1922, at the Marion Hotel in Little Rock, and at various other times and places, the particulars of which were unknown to him.

Appellees filed an answer specifically denying the material allegations in the bill and amendment thereto, and a cross-bill for alimony and attorney's fees.

On motion the court allowed appellee $200 per month alimony *pendente lite,* and a preliminary attorney's fee of $500. These allowances were paid by appellant.

The cause was submitted to the court upon the pleadings and testimony responsive to the issues of adultery, permanent alimony and attorney's fees, which resulted in a decree dismissing appellant's bill for the want of equity and an additional allowance of $1,500 for her solicitors, and permanent alimony in the sum of $250 per month, from which is this appeal. Appellee has prosecuted a cross-appeal from the allowances, seeking to have them increased.

The testimony introduced by appellant tended to support the specific charge of adultery, and that introduced by appellee tended to show that she was innocent of the charge. The record of the testimony is voluminous, and it would extend this opinion to great length to set it out in detail, so we shall only attempt to set out in a general way the history of the case leading up to the alleged act of adultery, and then briefly summarize the testimony responsive to that issue. The specific charge of adultery is entirely dependent upon the identity of the woman who was discovered and arrested with Elmer Walters in the Marion Hotel, room 379, in Little Rock, about 11 o'clock on the night of March 28, 1922. The burden was upon appellant to show that the woman in question was his wife. Appellant, having suspected the existence of an intimacy between Elmer Walters and his wife, had employed a detective by the name of Roy Stegall to

watch her. On the 27th day of March appellee drove over to Little Rock in the afternoon, in company with Mrs. Jeff Freeman and Mrs. Freeman's brother, Paul King. They arrived in Little Rock between five and six o'clock P. M. Before leaving Hot Springs appellee had got a clerk in the Como Hotel, partly owned by her husband, to telephone to the Marion Hotel to reserve a room for her and another lady. She and Mrs. Edith Brown, who had come to Little Rock earlier in the day, had arranged to occupy the same room at the hotel. When appellee arrived in Little Rock she stopped at the Marion Hotel for Mrs. Freeman and her brother to get out, and then went over to see the Pollocks on Scott Street. After visiting them she returned to the hotel, and registered in the name of Mrs. Ed Johnson, Hot Springs, and was assigned to room 379 on the third floor. When she registered the clerk remarked that another lady was to occupy the room with her, whereupon she asked whether she should register the other lady, and was told that it was unnecessary. She then met Mrs. Edith Brown on the mezzanine floor of the hotel, and they went to their room. Mrs. Brown informed her that Miss McFadden was at the Merchants' Hotel, and wanted appellee to spend the night with her. She left her grip in the room, and took her handbag, which contained her toilet articles, nightgown and other necessities, and went to the Merchants Hotel to spend the night with her lady friend. Later in the evening she called up another friend, Mrs. W. H. Park, who resided at 1900 Johnson Street, and invited her to go to the picture show. Mrs. Park came down in her car and, after the show, invited appellee and Miss McFadden to spend the night with her. They accepted the invitation. Early the next morning, the 28th, Mrs. Park took Miss McFadden and appellee to the Rock Island depot, and, while at the depot, appellee telephoned Mrs. Freeman to take breakfast with her. Miss McFadden left on the train, and Mrs. Park then took appellee down town, where they parted, with the understanding that they

would meet that evening at the Famous Cafe for dinner. Appellee then went to her room, took a bath, and, while resting on the bed, went to sleep. She was aroused by a telephone message from Mrs. Freeman, who was waiting to go to breakfast with her. She left Mrs. Brown in the room, who said she never ate breakfast until 10 or 11 o'clock. After breakfasting with Mrs. Freeman, appellee entered upon the performance of her duties as a delegate to the American Legion Auxiliary Convention, which was in session in Little Rock. She went to her room at the Marion about noon, where she again met Mrs. Brown. In the afternoon she attended the convention, and, in the performance of her duties, went on an inspection tour of the hospital at Fort Logan H. Roots. Upon her return she went to her room, where she found Mrs. Brown. After remaining there a short time she went to the cafe on Main Street to have dinner with Mrs. Park. According to the testimony of appellee and Mrs. Park, they drove around awhile after dinner, then went to the Merchants' Hotel, where appellee paid $4 for the room which Miss McFadden had engaged, and then to the home of Mrs. Park, where appellee spent the night on March 28. Mr. Park was away from home on the night of March 27, but returned on the 28th. He testified that appellee spent the night of the 28th in their home. Mr. and Mrs. Park fixed the date by the meeting of the convention of the American Legion Auxiliary. They knew of this meeting, and that appellee was in attendance upon it as a delegate.

Roy Stegall testified that he found out that room 379 in the Marion Hotel had been assigned to appellee, and that, early in the evening of the 28th, he had seen Elmer Walters enter an elevator in the basement of the Marion Hotel, and suspected that he was going to that room; that, upon inquiry, he ascertained that he had got off on the third floor; that he, Stegall, made arrangements to occupy a room across the hall from room 379, and stationed himself on a table so that he could look through

the transom and observe any one entering or coming out of room 379; that the bell-boy came up twice, first with ice water and then with lemonade, and that the door was opened on both occasions by appellee, who was dressed in a kimono; that later he heard a man cough in room 379, whereupon he notified Tom Moore, assistant manager of the hotel, that a man was in the room with appellee; that Moore, in company with R. A. Young, the hotel detective, and a man by the name of Evans, the hotel engineer, entered the room, and found Elmer Walters in the bathroom, in his night clothes; that appellee and Elmer Walters were arrested and turned over to T. L. Hooter, a policeman, who had accompanied the hotel proprietor and the detective to the third floor, and who waited for them in the hall until they came out of the room.

After Elmer Walters and the woman dressed they were taken by the police officer to the city hall, the woman into the chief's office and the man into the turnkey's office. The woman was interrogated by J. L. Bennett, the night chief, and a record was made, describing them. She gave her name as Vera Johnson, her residence as Hot Springs, and the following description of herself to the chief: weight, 140 pounds; height, 5 feet 4 inches; eyes, gray; hair, brown. This was a correct description of Mrs. Edith Brown. Appellee has brown eyes, black hair, is about 5 feet high, and weighs 118 pounds. Cases for immorality were docketed against the man and woman in fictitious names, and they were released upon cash bonds of $15 each, which were deposited by the woman. After being discharged, the woman went to the Capital Hotel and registered under the name of Mrs. L. Johnson, Hot Springs. Several days afterwards the name of Mrs. L. Johnson was erased, and that of Mrs. Edith Brown was substituted for it on the Capital Hotel register by Elmer Walters.

Elmer Walters testified that the woman arrested with him in room 379 on the night of March 28, 1922, was Mrs. Edith Brown.

· Mrs. Edith Brown testified that she was the woman arrested with Elmer Walters in the room on the occasion referred to, and that, after their arrest and discharge, she registered for the remainder of the night at the Capital Hotel in the name of Mrs. L. Johnson, because she understood that was the way Mrs. Johnson had registered at the Hotel Marion, and that the baggage would be sent over from the Marion to the Capital Hotel in that name; that, several days afterwards, she had Elmer Walters change the register and substitute her own name for fear she would implicate Mrs. Johnson.

Tom Moore and R. A. Young testified that appellee was not the woman who was arrested in the room with Elmer Walters by them and turned over to the police. They described the woman who was found in the room, and their description tallied with the description of Mrs. Edith Brown.

J. L. Bennett and T. L. Hooter testified that appellee was the woman who was brought by T. L. Hooter from the Marion Hotel to the police station with Elmer Walters. They testified six or seven months after the episode, and, when appellee and Mrs. Edith Brown were presented to them, they identified appellee as the woman who was arrested upon the charge of immorality, and who deposited cash bail for herself and Elmer Walters on the night of March 28, 1922.

When appellee first testified she denied having seen Elmer Walters while in Little Rock, but, after Mrs. Jeff Freeman testified that appellee introduced Elmer Walters to her while they were lunching together on the 29th of March, she was recalled, and testified that she had seen him at that time, and that he went back to Hot Springs that afternoon in the car with Mrs. Freeman and herself.

There was some conflict between the testimony of appellee and Mrs. Freeman relative to statements made by appellee when registering at the Marion Hotel and with reference to visiting the Pollocks on Scott Street.

It was shown that appellee associated with Elmer Walters and Mrs. Edith Brown both before and after the separation between appellee and appellant. Elmer Walters had taught appellee how to swim, and had, on various occasions, danced and gone automobile riding with her. Appellee testified that her husband had encouraged and sanctioned her association with both these parties.

After the episode at the Marion had gained notoriety, appellee went to see Mrs. Freeman and Mrs. Maggie King, who had testified in reference to appellee's association with Elmer Walters, and, according to their testimony, made an effort to get them to suppress these facts. On cross-examination, however, Mrs. King admitted that their conversation pertained to the proposition that appellee regarded her as a good woman who would tell nothing but the truth, and Mrs. Freeman admitted that she requested appellee not to draw her name into the affair if it could be avoided.

John Green, one of appellant's attorneys, testified that he sent for appellee after the escapade at the Hotel Marion, and openly charged her with being in room 379 with Elmer Walters, which charge she denied, claiming that she spent the night of the 28th of March, 1922, at the Merchants' Hotel with Ona McFadden, and did not intimate that she had spent the night with Mr. and Mrs. Park.

There was a conflict between the testimony of Roy Stegall and Moore and Young. Moore and Young testified that, when they asked Stegall whether the man and woman were the parties he wanted, he said the man was, but that he did not see the woman, and would rely upon the register for her identification. Stegall denied making this statement to them.

Other discrepancies exist in the testimony, but I deem it unnecessary to refer to them. Suffice it to say, without further detail, that the charge of adultery was supported by the testimony of Roy Stegall, J. L. Bennett and T. L. Hooter, whose testimony was corroborated by circumstances testified to by other witnesses as above

set out; and that appellee's innocence was supported by the testimony of herself, Mrs. Edith Brown, Tom Moore, R. A. Young, Mr. and Mrs. Park, Elmer Walters, and the recorded description in the police record of the woman who appeared there, as well as other favorable circumstances which were developed in taking the testimony.

After a careful reading and analysis of the testimony, a majority of the court are of the opinion that the finding of the trial court, purging appellee of the charge of adultery, is supported by the weight of the evidence. Mr. Justice HART is of the opinion that the charge of adultery was established by the preponderance of the testimony.

The next and last issue presented by the appeal and cross-appeal for determination by this court is allowances of attorney's fees and permanent alimony. The record reflects that appellant is a very wealthy man. The estimated value of his estate is $250,000, and his annual income at about $25,000. Appellee, however, did not assist him in accumulating this fortune. He was a widower of sixty-eight years of age, and appellee a *divorcee,* thirty-one years of age, at the time of their marriage. They only lived together six years before the separation. This lawsuit has been a hotly contested long-drawn-out affair, involving much skill and time on the part of eminent counsel employed by the parties. Taking into consideration the nature of the charge made against appellee, the successful defense made in her behalf, and the ability of appellant to pay for legal services, we think the amount allowed by the chancellor to appellee for her attorneys is fair and just. We cannot affirm the allowance, however, made by the learned chancellor to appellee as permanent alimony. In affirming the finding of the trial court upon the issue of divorce, the majority did not intend to place the stamp of approval upon the conduct of appellee. While the evidence is insufficient to brand appellee as an adulteress, it did show that she had been and was associating with Mrs. Edith Brown

and Elmer Walters, who were arrested and fined upon the charge of immorality. Appellee's association with Elmer Walters was continued, over the protests of her husband, and with both of them after she ascertained that they had been arrested in her room at the Marion Hotel for immorality. We do not think such conduct on her part becoming or circumspect, and must take her persistent association with them into account in fixing the amount of alimony. Her association with Elmer Walters had a great deal to do with the separation. This court said in the case of *Shirey* v. *Shirey*, 87 Ark. 175 (quoting from syllabus 6):

"The amount to be allowed as alimony is within the sound discretion of the trial court; and all the circumstances of the particular case should be considered in fixing it, such as the husband's ability to pay, the station in life of the parties, and the conduct of the wife bearing upon the cause of separation." A good discussion by the Supreme Court of Alabama of the reasons for this rule will be found in the case of *Jones* v. *Jones*, 11 So. 11.

Applying the rule thus announced to the facts in this case, we think the allowance made by the trial court should be reduced to $150 per month, and so order.

The decree is therefore modified in this respect, and, as modified, is affirmed.

Chief Justice McCULLOCH dissents from the modification.

Mr. Justice HART dissents from that part of opinion refusing to grant a divorce.

### DISSENTING OPINION.

McCULLOCH, C. J. If I thought that appellee had, before and after the episode at the hotel in Little Rock, habitually associated with men and women of bad character, I would be in favor of granting appellant a divorce on the sharply disputed question whether the appellee or Mrs. Brown was the woman found in the room with Elmer Walters. In other words, if the association of appellee was so bad that she is not entitled to a proper allowance for her support, it has such an

important bearing on the question of her relations with Walters that it is of controlling force in determining the issue of adultery.

The evidence does not show that either Mrs. Brown or Walters was a person of bad character before the incident at the hotel occurred nor since that time, except as their reputations may be affected by that occurrence. The proof shows beyond any dispute that all of appellee's association, both with Walters and Mrs. Brown, before the incident, was with the knowledge and consent of appellant. When appellee danced with Walters, it was in the presence of her husband, and the testimony shows that he encouraged her to attend the dances. When she rode with Elmer Walters and went to the swimming pool, it was with the knowledge of her husband, and they were accompanied by another lady in Hot Springs whose reputation and character has not been brought in question.

Appellee frankly admitted in her testimony that since the occurrence at the hotel and the accusation of adultery made against her by her husband, and the conduct of Mrs. Brown in openly acknowledging that she was the woman in the room with Walters, she could not find it consistent with her feeling of gratitude to Mrs. Brown to cut her acquaintance and to refuse entirely to associate with her. Appellee gives, I think, a very reasonable explanation of her conduct, and one that is consistent with the natural impulses of most any person situated as appellee was with an ugly accusation against her. She should not be blamed for indulging friendliness toward one who, as did Mrs. Brown, acknowledged herself to be the sinner.

The Shirey case, cited by the majority in their opinion, has no application to the present case, for the facts are different. In that case, the wife sued the husband for divorce, but was denied a divorce on the ground that she had condoned her husband's wrongdoing. The court allowed the wife support, but, in fixing the amount, took into consideration her own improper

conduct. In the present case no such state of facts exists. Appellee has not asked for a divorce. On the contrary, she has, according to the undisputed evidence, sought in every way to regain her husband's affections and confidence, and, as before stated, there is nothing in the record rightly affecting her character. Her husband is shown to be a man of wealth and large income. Certainly the allowance made by the chancellor is not out of keeping with the ability of appellant to pay. I dissent therefore from that part of the judgment of this court which reduces the allowance to appellee.