Bonnie Faye FORD *v.* Taid FORD, Jr.

CA 80-143                                              605 S.W. 2d 756
Court of Appeals of Arkansas
Opinion delivered September 24, 1980
Rehearing denied October 29, 1980

*Cathey, Goodwin, Hamilton & Moore*, by: *Donis B. Hamilton*, for appellant.

*Burris & Berry*, for appellee.

Steele Hays, Judge. The parties, husband and wife, were divorced by decree dated January 23, 1979. The wife brings this appeal from certain portions of the decree. Three issues are raised, the primary issue being whether the chancellor erred in the division of personal property by not applying the criteria contained in Act 705 of 1979. Because it is clear that Act 705 was not applied, the case is reversed and remanded.

Bonnie Faye Ford and Taid Ford Jr., were married in March, 1960. She was 17 years of age at the time and had not completed high school. The couple began their marriage with no property of consequence and Mr. Ford began farming cotton on rented land. The couple had their first child, a son, in 1961 and their second, a daughter, in 1974. Mrs. Ford worked in the home and seems to have helped considerably in the fields in the first years of the marriage, admittedly the first seven or eight, disputedly after 1968 or 1969. In 1969 or 1970, Mrs. Ford began working as a secretary in a framing business, which continued for three or four years. Her wages were used for family needs or applied to savings jointly held. By all accounts, she was frugal in money matters. There is some dispute as to whether she prepared meals as regularly as Mr. Ford had a right to expect and whether he was not entitled to have his work clothing washed more frequently, although Mr. Ford describes her as having been a good housekeeper. He testified that she did not always prepare meals for him; she contended that he preferred to eat frequently at O'Kean's store, notwithstanding her pleas to eat at home.

Mrs. Ford testified that she began experiencing depression before becoming pregnant with her daughter. The depression became acute a few months prior to birth. She did not leave the hospital after the delivery, but was transferred directly from maternity to the wing for psychological treatment. Since 1974, she has had intermittent, lengthy institutional care for recurrent, severe depression and apparently has been regularly under the care of psychiatrists since that time. She has undergone electro-shock therapy on

more than one occasion, and has attempted suicide at least once. The evidence clearly supports the conclusion that Mrs. Ford has a genuine, long standing depression of immobilizing effect.

The parties have not resided together for the past five and one-half years, although they have had sexual relations on several occasions, most recently after suit was filed.

Mr. Ford has clearly been an industrious, capable farmer, and the evidence shows that over the years the labor and prudent management of the Fords has enabled them to acquire and improve farm lands of approximately 190 acres, to build a home, and to accumulate substantial farm equipment and savings, the personal property aggregating around $300,000.00 by some estimates, $360,000.00 by others, all debt free. In addition to the farmlands owned jointly, Mr. Ford farms some 800 additional acres which he rents from his father.

At the close of trial, the chancellor made lengthy comments concerning his findings so as to give clarity to the decree, which have been beneficial to counsel and to this court. The decree granted the divorce, on uncontested evidence, to Mr. Ford, along with custody of their daughter, Brandy, which Mrs. Ford conceded to be in their daughter's best interest. Possession of the home and one acre was given to Mr. Ford until Brandy reaches her majority. The remaining acreage was converted to tenancy in common and ordered sold. Alimony was denied at the present time, although the court reversed jurisdiction as to possible future needs. In dividing personal property, the court concluded on the basis of the case of *Poskey* v. *Poskey*, 228 Ark. 1, 305 S.W. 2d 326 (1957), that Act 705 of 1979 could not be applied retroactively to property which had vested prior to the effective date of the Act. On that assumption, the court awarded Mrs. Ford 10% of the personal property which the chancellor calculated to be approximately $300,000.00. The formula for this division was arrived at on the basis of Mr. Ford's testimony that of the total acreage which he farmed, 20% belonged to the Fords jointly and since Mrs. Ford's interest therein was one-half, she was entitled to one-half of 20%, or 10%. The

chancellor allowed Mrs. Ford's solicitors a fee of $1,000.00 to be paid by Mr. Ford.

Appellant appeals only from the chancellor's division of personal property, the denial of alimony, and the amount of fee allowed.

In substance, Act 705 provides that at the time a divorce decree is entered "all marital property shall be distributed one-half to each party, unless the court finds such a division inequitable." If the court finds an equal division inequitable, it shall consider the following criteria:

(1) Length of the marriage

(2) Age, health and station in life of the parties

(3) Occupation of the parties

(4) Amount and sources of income

(5) Vocational skills

(6) Employability

(7) Estate, liabilities and needs of each

(8) Opportunity for further acquisition of assets and income

(9) Contribution of each party in the acquisition, preservation or appreciation of "marital property," including services as a homemaker.

Marital property is defined as all property acquired by either spouse subsequent to the marriage, except for gifts, inheritance, exchange, etc.

One proviso clearly present in Act 705 is the requirement that when property is not divided one-half to each, the court *must* state in writing the basis and reasons for not doing so in accordance with the above criteria. Appellee argues that

the court's comments dictated into the record was done in compliance with this requiremen, but that cannot be confirmed; none of the criteria are mentioned.

We believe the chancellor erred in interpreting *Poskey* v. *Poskey* as requiring that Act 705 of 1979 can be applied only to personal property acquired after the effective date of the act. The decision in *Poskey* simply followed the earlier case of *Jenkins* v. *Jenkins*, 219 Ark. 219, 242 S.W. 2d 124 (1951), in holding that an estate by the entirety in land acquired *prior* to the effective date of Act 340 of 1947 cannot be dissolved by the chancellor in divorce cases and treated as a tenancy in common. In *Jenkins*, the court acknowledged that a majority of states hold that an estate by the entirety can be dissolved by divorce decree, but that in Arkansas the contrary view had become a rule of property and, hence, Act 340 could only be applied prospectively. Whatever may be said of *Jenkins* v. *Jenkins*, there is nothing in that opinion or in *Poskey* v. *Poskey* to require us to apply such a restrictive concept to Act 705 in a case affecting personal property in divorce. In fact, chancery courts have had the inherent power to divide personal property in divorce suits in accordance with the equities of the case, both by statute and at common-law, for decades. *Williams* v. *Williams*, 186 Ark. 160, 62 S.W. 971 (1932). *Nelson* v. *Nelson*, 267 Ark. 353, 590 S.W. 2d 293 (1979.)

Appellant argues that an equal division of property should have been ordered by the trial court, irrespective of whether Act 705 criteria are applied and a number of decisions support that view: *Williams* v. *Williams, supra*; *Stephens* v. *Stephens*, 226 Ark. 219, 288 S.W. 2d 957 (1956); *Nelson* v. *Nelson, supra*. In *Nelson*, the court stated:

We have long held that a court has a right to divide property acquired through the joint efforts of the parties on an equitable basis. *Stephens* v. *Stephens*, 226 Ark. 219, 288 S.W. 2d 957 (1956). When the parties were married they did not own this property. It was acquired, during the marriage, through the joint efforts of the parties. We are not required to make a determination as to whether more money or effort was expended on the part of one party or the other in reaching this conclusion. For about

18 years all of the efforts of both parties were directed to the acquisition and operation of the farm. Both of them assisted in raising the children as well as doing all other duties necessary to the operation of the farm. After appellant became employed, outside the home, her money was used to pay household expenses, purchase groceries, and repair and refinish the house in Waldron. In discussing the matter of disposition of property in a divorce proceeding, when the property was held only in the husband's name, we stated in the case of *Williams* v. *Williams*, 186 Ark. 160, 52 S.W. 2d 971 (1932):

> . . . If appellee and appellant by their joint work, labor, and management, acquired the property, a court of equity would even before the recent statutes, protect the wife's interest in the property.

And . . .

> We think the law relating to ownership of personal property is the same as that cited in the previous point relating to ownership of real property.

We view the difference between the decisions regarding a wife's right to property before the enactment of Act 705 and afterward as being largely a matter of emphasis. In the earlier class of cases, the emphasis was on the degree to which the wife contributed to the joint earnings of parties and, thus, the wife whose primary activities were those of a homemaker was subject to being penalized in a divorce by her inability to point to actual monetary contributions during the marriage. Act 705 seeks to correct the inequity inherent in that approach by expressly including homemaking as one element for the court to consider if it departs from an equal division. But the basic premise of Act 705, we believe, is that "marital property" belongs to the parties jointly. We conclude that it was error to divide marital property on a ratio of 90% to Mr. Ford and 10% to Mrs. Ford and to fail to give reasons therefor pursuant to the criteria of Act 705.

We must next decide whether it is better for this case to be remanded with instructions to the trial court to apply Act

705 in the first instance but without binding that court by our view, or for us to reach first the decision of whether the property in question should be divided equally under Act 705.

We are especially conscious of the admonition expressed in *Ferguson* v. *Green*, 266 Ark. 556, 587 S.W. 2d 18 (1979). Referring to the trial de novo of chancery cases on appeal, Mr. Justice Fogleman wrote:

> Where the case has been once heard upon the evidence or there has been a fair opportunity to present it, this court will not usually remand a case solely to give either party an opportunity to produce other evidence; the rule, however, is not imperative and this court has the power, in furtherance of justice, to remand any case in equity for further proceedings, including hearing additional evidence. *Fish* v. *Bush*, 253 Ark. 27, 484 S.W. 2d 525; *Wilson* v. *Rodgers* (on rehearing), 250 Ark. 356, 68 S.W. 2d 750; *Nakdimen* v. *Atkinson Improvement Co., supra*; *Brizzolara* v. *Powell*, 214 Ark. 870, 218 S.W. 2d 728. It has been the invariable practice of this court not to remand a case to a chancery court for further proceedings and proof where we can plainly see what the equities of the parties are, but rather to render such decree here as should have been rendered below. *Pickett* v. *Ferguson*, 45 Ark. 177, 55 Am. Rep. 545; *Narisi* v. *Narisi*, 233 Ark. 525, 345 S.W. 2d 620. See also, *Baxter County Bank* v. *Copeland*, 114 Ark. 216, 169 S.W. 1180. The usual practice is to end the controversy by final judgment here or by directions to the trial court to enter a final decree. *Wilborn* v. *Elston*, 209 Ark. 670, 191 S.W. 2d 961. With the evidence fully developed, this court should decide the case without remanding it to the chancery court. *Lewis* v. *Lewis, supra*.

We recognize that some implementation of this decision by the trial court cannot be avoided, and should not be, as most divorce cases with property and minor children require some continuing oversight by the chancellor. However, we think considerable time can be spared the court and the litigants if we determine, at least in broad terms, what division we deem equitable on these facts, as opposed to simply

remanding the case to the chancellor to make that determination in the first instance. We are satisfied that the length of this marriage, the contribution of each spouse, the children born and raised, indeed all the many considerations that experience and training validate, the property acquired by the Ford couple was "marital property" in the sense and spirit the term is used in Act 705. We find no circumstances present in this record to render an equal division of the property inequitable, unless the emotional illness which disabled Mrs. Ford is regarded as a detraction. Without applying a standard broader than this one case, we believe that it would be inequitable under all the circumstances of this record to hold that Mrs. Ford's share of marital property should be reduced in any significant degree because of an illness as clearly disabling as hers appears to be.

In treating the appeal in this fashion we are following the pattern of *Nelson* v. *Nelson, supra,* wherein the Supreme Court reversed the chancellor's award of one-third of the property, real and personal, to the wife and awarded her one-half instead, remanding the case with this comment:

> We have not attempted to deal with every item of personal property because the trial court is in a much better position to make this determination. It may become necessary to hear additional evidence for a proper decision by the trial court.

We recognize that the trial court is in a better position to oversee the actual division of the personal property and to order, where necessary, the adjustment of assets in kind. Obviously, the farm equipment is more useful and productive in the hands of Mr. Ford; furthermore, the chancellor's concern with Mrs. Ford's ability to give prudent management to her own property may well dictate some means of protecting her, even by trust or guardianship, if necessary. We think, too, that the financial burden on Mr. Ford relative to their daughter and their son's college expenses are worthy of consideration.

Turning to the matter of alimony, we believe the chancellor's refusal to allow alimony at this time was not un-

reasonable and clearly not an abuse of his discretion in such matters. It is of significance that the court did not close the door to alimony at a later time, depending upon future needs. The allowance and the amount of alimony is governed by many considerations and is a matter for the discretion of the trial court. *Johnson* v. *Johnson*, 165 Ark. 195, 263 S.W. 379 (1924); *Lewis* v. *Lewis*, 255 Ark. 583, 502 S.W. 2d 505 (1973).

Some of the circumstances which the trial court no doubt considered in deferring alimony are the fact that Mr. Ford has the responsibility and expense of the children; the fact that Mrs. Ford's needs appear to be conservative in the extreme; and the fact that she is receiving a sizeable proportion of joint assets as a consequence of the divorce. Under all the circumstances we cannot say that the chancellor's discretion was abused by the deferment of alimony; on the contrary, we think at the present that appears to be a just decision.

Appellant argues vehemently that the allowance of a temporary fee of $500.00 and a fee of $1,000.00 at completion to be paid by Mr. Ford is grossly insufficient. But it has been repeatedly held that the allowance of fees is within the sound discretion of the trial court and will not be disturbed on appeal in the absence of a clear abuse. *Equitable Life Assurance Society* v. *Rummell*, 257 Ark. 90, 514 S.W. 2d 224 (1974). *Federal Life Insurance Co.* v. *Hase*, 193 Ark. 816, 102 S.W. 2d 841 (1937). That principle is especially apt, we believe, when applied to domestic suits where, as here, substantial assets are involved. The fee being allowed in the latter class of cases is not, after all, the entire fee — but merely that part which in fairness the chancellor feels should be borne by the husband. Where the wife's share of joint properties is sizeable, relative to the rank and file of divorce cases, it is even more appropriate for the trial judge's discretion to govern, as he is in the position of balancing and weighing many factors against each other. There is no doubt but that appellant's lawyers have labored effectively and tirelessly in her behalf as the trial court noted. They are entitled to a reasonable fee and presumably will realize that end. However, it is not for us to speculate as to the precise amount when many of the factors that go into fee determination are not present in the record.

Mr. Ford was found to be without fault. Mrs. Ford is recovering ample resources. Many cases affirm the wisdom of giving the trial court broad discretion to determine what portion of a wife's fee should be paid by the husband. *Lytle* v. *Lytle*, 266 Ark. 124, 583 S.W. 2d 1 (1979). *McGuire* v. *McGuire*, 231 Ark. 613, 331 S.W. 2d 257 (1960); *Yohe* v. *Yohe*, 238 Ark. 642, 383 S.W. 2d 665 (1964); *Cook* v. *Cook*, 233 Ark. 961, 349 S.W. 2d 809 (1961). For their services in connection with this appeal appellant's solicitors are allowed a fee of $1,500.00 and costs.

We mention one other point parenthetically. In this record and noted in both the majority and the dissenting opinions is the fact that it is undisputed that these parties engaged in marital relations while this suit for divorce was pending. Clearly, had that point been raised before the trial court and on appeal, we would be beholden to dismiss the litigation. However, marital relations between litigants in divorce does not create a jurisdictional deficit, but merely creates an affirmative defense in the hands of either party *which must be raised*. Except for the lack of corroboration in contested divorces which is statutor and may not be waived, the rule of appeal and error holds firmly that we may consider only those points and assignments of error raised on appeal and the decree of the chancellor will not be reviewed upon a ground not argued by the appellant. Ark. Stat. 1947 Ann. 27-2143. *Cummings* v. *Broyles*, 242 Ark. 923, 415 S.W. 2d 571 (1967); *Johnson* v. *Gammill*, 231 Ark. 1, 328 S.W. 2d 127 (1959). Although chancery cases are tried *de novo*, they are not reversed on grounds not argued by appellant. *Bowling* v. *Stough*, 101 Ark. 398, 142 S.W. 512 (1911). *McIlhaney* v. *Cox*, 257 Ark. 934, 521 S.W. 2d 66 (1975). *Country Gentleman, Inc.* v. *Harkey*, 263 Ark. 580, 569 S.W. 2d 649 (1978).

Reversed in part and remanded with instructions to proceed in accordance with this opinion.

HOWARD and NEWBERN, JJ., dissent.

GEORGE HOWARD, JR., Judge, dissenting. The evidence in this record dictates an order of this Court reversing the action of the trial court in granting an absolute divorce and dismissing the action for want of equity. I, therefore, cannot

join in the action of the majority and accordingly, I dissent.

The appellee, Tait Ford, Jr., alleged the following as grounds for an absolute divorce from his wife, the appellant, who were married on March 18, 1960 and lived together as husband and wife until sometime in August, 1974:

> "4. Plaintiff alleges that for the past several years the Defendant has treated him with studied neglect, contempt and ridicule, all of which were systematically pursued and continued over a long period of time so as to render the condition of the plaintiff with defendant intolerable."[1]

The appellee-husband in seeking to establish his grounds for an absolute divorce testified on direct examination:

> "Q. During the time that you lived together, did your wife keep house?
>
> A. She was a good housekeeper.
>
> Q. Did she cook meals for you?
>
> A. A few.
>
> Q. Did she wash your clothes?
>
> A. Yes, she would keep them real clean, but I didn't get to change very regular.
>
> Q. Why not?
>
> A. She always wanted me to wear them just one more day.
>
> . . .

[1]While the appellant filed her answer denying allegations, appellant, prior to the commencement of the trial, advised her attorney not to contest her husband's divorce action. Consequently, the only issue, purportedly, left for the trial court's determination was the division of the property acquired by the parties. Appellant seeks a review of the division of the property only.

Q. Did she prepare the evening meal for you and your son when you were working?

A. Sometime

Q. Well, how frequently?

A. Maybe half the time.

Q. And where did you normally take your meal?

A. I would eat at the store at O'Kean.

Q. What would you eat at the store?

A. A sandwich.

. . .

Q. Did it finally get to the point that your wife simply refused to live in the house?

A. Yes.

Q. And that continued for a long period of time?

A. Yes.

. . .

BY THE COURT:

". . . [T]he Court understands opening statements from counsel, the grounds of divorce and custody of the children is not in dispute. The defendant intends that grounds only be treated as an uncontested case and that at this time the defendant is not asking custody of the children. That according to the pleadings and the statement of counsel . . . the defendant has been under the care of psychiatrists and psychologists from 1974 to date and no point is seen in going more deeply than is necessary into grounds or

child custody. If the court understands that correct-
ly, I am going to ask you to terminate the testimony
on those parts. . . ."

However, on cross-examination, Mr. Ford gave the
following testimony:

"Q. Sonny, your wife has been in the mental institution
on and off since 1974, isn't that correct?

A. Yes.

Q. And prior to the time that she first went into the
mental institution in 1974 she was pregnant with Bran-
dy, your youngest daughter.

A. Yes.

Q. And at that time she exhibited symptoms of lack of
energy and lying on the couch and crying and not want-
ing to do things and become involved, is that correct?

A. Yes.

Q. And that has existed for a period of a year or so prior
to 1974.

A. Yes.

. . .

Q. And she was actually hospitalized in George Jackson
Mental Health Center in 1974 prior to the birth of Bran-
dy.

A. Yes.

. . .

Q. And she was in and out of these mental institutions
for periods of time from 1974 until 1977. Is that correct?

A. Yes.

Q. And under constant psychiatric care and treatment.

A. Yes.

Q. In 1977 she came back to the O'Kean, Delaplaine and Corning area, didn't she?

A. No, she came to the Corning area.

Q. All right. She came to the Corning area. Where did she come to?

A. Her father and mother's house.

Q. Did you visit her there?

A. Yes.

Q. I see. And isn't it true that during the course of your visits there in 1977 that you and she resumed your marital relationship?

A. Yes.

Q. *Isn't it also true that as late as the night before the summons was served in this case, that you and she engaged in sexual relations?*

A. *Yes.*

Q. So the entire period of time of which you complain of her inability to see to your needs and assist you were periods of time during which she was under going psychiatric care and treatment or was being hospitalized intermittently for psychiatric treatment.

A. Yes.

Q. And that treatment was for depression, wasn't it?

A. Yes." (Emphasis added)

On direct examination, the appellant stated:

"Q. All right. Why have you instructed me not to contest the issues relative to the divorce?

A. Because for a year I have begged and pleaded with Sonny for us to get back together and I could not give up hope. Sometimes he would make me think, maybe we would and then other times he would say he wanted no part of it, and you know I did everything in my power that I could to get our family back together. I wanted that more than anything. But I know that he is unhappy you know and he has been through a lot of hell I know and he's young and he deserves a decent life and I am sure he doesn't want any part of me and if he don't want me, I don't need him.

A. All right."

On cross-examination, the appellant testified:

"Q. Now Mrs. Ford, when your husband works late at night, would you prepare him a hot supper?

A. Yes, when he came in, but I never knew what time it was going to be. Six, seven, eight, nine, ten, eleven.

Q. Now isn't the true of the matter that he and Barry would work in the fields until too dark to see and they would come home and supper would either be a bologna sandwich or a bowl of chili, sometimes both, but —

A. Maybe after I got sick but not before then. And I would beg him to eat breakfast. I loved, I used to beg him. He would say, no, I want to go to Omer's Store, and he would not eat and he would not come home for dinner, and he would say, I don't know where I am going to be. I'm not coming home. And every babysitter has told me the same thing that he's never home but for one meal and sometimes he doesn't come for that meal.

And I have offered to cook it and he said, no, he wants to go to Omer's."

While counsel for the parties and the court were laboring under the view that the husband was pursuing an uncontested divorce, the fact of the matter clearly evidences:

1. That evidence offered by counsel and received into evidence clearly shows that the husband is not entitled to a divorce; and,

2. By the husband's own admission, his conduct of resuming voluntarily marital relations with the appellant amounts to a condonation, thus, wiping out any purported grounds for an absolute divorce.

3. The trial court was duty bound, given the circumstances in this case, to articulate the State's interest in preserving the stability of family life and opposing the granting of a divorce unless a litigant establishes his grounds according to the statutory requirements, by dismissing the appellee's divorce action for want of equity on its motion.[2]

In 24 Am. Jur. 2d, Divorce and Separation, § 49, page 491, it is provided:

"The court, as the representative of the state and in the protection of the state's interest in opposing the granting of divorces unless the case made is one which comes within the rules prescribed by statute, frequently will of its own motion dismiss a divorce proceeding when it becomes apparent that a case for divorce is not made out within the meaning of the statutes. It may dismiss the suit of its own motion . . . should come to the attention of the court, either before or during the hearing on the merits, that the parties hae become reconciled. . . . *The court may notice affirmative defenses which have not been special-*

---

[2]As counsel admitted. during oral argument, Arkansas is not a no fault divorce state, consequently, a party desiring a divorce has the burden of proof, even in uncontested cases, to establish his grounds as required under the statutes.

*ly pleaded, and where the evidence reveals the existence of a defense it may dismiss the action, or where it appears that there is collusion between the parties, or that neither is entitled to a divorce . . . ."* (Emphasis added)

In 27A C.J.S., § 135, Divorce, page 438, it is provided:

"In order to authroize a decree of divorce there must be clear and satisfactory proof of the cause of action *even where defendant fails to offer evidence in the divorce proceeding, or in proceedings in which the case is submitted on ex parte depositions . . .*" (Emphasis supplied)

The Arkansas Supreme Court, in articulating the same view, made the following observation in *Napier* v. *Napier*, 237 Ark. 159, 371 S.W. 2d 841:

"As we have said so many times, the State is also a party to the marriage . . . and this is a contract that should no be dissolved capriciously."

In *Kientz* v. *Kientz*, 104 Ark. 381, 149 S.W. 86, the Arkansas Supreme Court stated:

". . . The marriage state can not be considered as one of convenience, but it is one which has been entered into 'for better or for worse' and must continue for life unless sundered for the grounds named in the statute justifying its dissolution, *which must be proved by clear evidence.*" (Emphasis added).

In *Sutherland* v. *Sutherland*, 188 Ark. 955, 68 S.W. 2d 1022, the Court observed:

"It should be distinctly kept in mind that marriage vows are solemnly assumed and should be sacredly kept. The interest of society demands that the bonds of wedlock should not be severed, *except upon grounds prescribed by statute and established by testimony.*" (Emphasis added)

Even though this case is here on the issue involving the division of property rights, this Court is not precluded from

recognizing the fact that the action should have been dismissed below for want of equity. It is settled law that an appeal from a chancery court decree is tried *de novo*; and where it is shown that the relief prayed for should have not been granted, the appellate court will reverse and dismiss the action. *McQueen* v. *McQueen*, 140 S.W. 2d 1012.

The record made by the husband to establish his grounds for divorce is before us as well as relevant testimony of the wife. Even if the record were incomplete, we could not indulge the presumption that the omitted portion of the record would sustain what appears to be an error, *Reed* v. *Reed*, 238 Ark. 840, 385 S.W. 2d 33 (1964); *Southern Farmers Assn., Inc.* v. *Wyatt*, 234 Ark. 649, 353 S.W. 2d 531 (1962). Moreover, it is plain that the trial court relied upon the testimony in this record in granting appellee a divorce.

The majority concedes that the parties engaged in marital relations while the action was pending and, consequently, the action should have been dismissed, but avoids coming to grips with this issue by asserting that neither party raised the issue on appeal; and that while chancery cases are tried *de novo* on appellate review, such cases are not reversed on grounds not argued by the appellant. Scrutiny of applicable cases does not support the majority's posture.

When a chancery case is appealed to this Court, the review conducted by this Court opens the whole case as if the action had never been tried as to all issues made in the court below. *Woodruff* v. *Core*, 23 Ark. 341 (1861). The whole case is before the appellate tribunal and the appellate court passes upon the record as to the facts as well as to the law and this Court renders its decree based upon such record as if there had been no decision at the trial level. *Arkansas Bankers' Association* v. *Ligon*, 174 Ark. 234, 295 S.W. 4 (1927); *Grayson* v. *Bowie*, 197 Ark. 128, 122 S.W. 2d 536 (1938); *McCrite* v. *Hendrix College*, 198 Ark. 1149, 133 S.W. 2d 31 (1939).

In reaffirming this standard of review of chancery cases, the Arkansas Supreme Court, in *Ferguson et al* v. *Green et al*, 266 Ark. 556, 587 S.W. 2d 18 (1979), made the following observation:

When the case reached this court on appeal, it was reviewed as all equity cases are and should be reviewed. Equity cases are tried de novo on appeal upon the record made in the chancery cour, and the rule that this court disposes of them and resolves the issues on that record is well established; the fact that the chancellor based his decision upon an erroneous conclusion does not preclude this court's reviewing the entire case de novo. . . . An appeal in a chancery case opens the whole case for review. All of the issues raised in the court below are before the appellate court for decision and trial de novo on appeal in equity cases involves determination of fact questions as well as legal issues. . . . The appellate court reviews both law and fact and, acting as judges of both law and fact as if no decision had been made in the trial court, sifts the evidence to determine what the finding of the chancellor should have been and renders a decree upon the record made in the trial court. . . . The appellate court may always enter such judgment as the chancery court should have entered upon the undisputed facts in the record. . . .

This Court, as an appellate tribunal concerned with the uniform application and administration of the laws in the lower courts, cannot sanction the granting of the divorce under the circumstances which are not only disturbing, but raise a serious due process of law question. This is particularly true since the trial court found that appellant did not have sufficient capacity to manage and preserve her property rights, on the one hand, but obviously, on the other hand, concluded she possessed the requisite capacity to participate in a legal proceeding that terminated a marriage relationship which the State of Arkansas has a direct interest in fostering when the complaining party has not demonstrated sufficient grounds.

Accordingly, I respectfully dissent.

DAVID NEWBERN, Judge, dissenting. I agree with that part of Judge Howard's dissenting opinion which says there was not sufficient evidence showing the appellee had any ground for divorce. Even the most liberal construction of the

indignity ground as provided in Ark. Stat. Ann. § 34-1202 (Supp. 1979), would not permit the granting of a divorce upon testimony such as that given in this case. Even in jurisdictions which have "no fault" divorce, divorce by consent is not permitted. There must be, in those jurisdictions, testimony of the irretrievable breakdown of the marriage. Presumably, even in those more liberal legal circumstances, the state maintains an interest in preserving marriages. I see nothing in the majority opinion which deals with the well known fact that the State of Arkansas has such an interest which was not protected in this case. Therefore, I would reverse.