C. K. FISH JR. ET UX *v.* S. C. BUSH

5-5962                                                                484 S.W. 2d 525
Opinion delivered September 11, 1972

[Rehearing denied October 9, 1972.]

*Brockman, Brockman & Gunti,* for appellants.

*John F. Gibson,* for appellee.

GEORGE ROSE SMITH, Justice. This is a boundary line dispute involving a fence that two brothers, Bob and S. C. Bush, erected between their respective tracts in 1955, or possibly even earlier. The appellants, who have acquired the Bob Bush land, contend that the fence became the boundary by acquiescence on the part of the two brothers over a period of fifteen years or more. The chancellor rejected that theory and, relying upon the testimony of surveyors, fixed the disputed line a few feet north of the fence. For reversal the appellants contend primarily that their claim of a boundary by acquiescence is supported by the weight of the evidence and, alternatively, that the cause should be remanded for further proof. We cannot sustain either contention.

The suit involves a quarter section of land described as the Northeast Quarter of a certain Section 31 in Lincoln county. About 30 years ago the land was owned by J. F. Bush. He conveyed to one of his sons, Bob Bush, the north half of the tract and the east ten acres of the south half, totaling about 90 acres. Mr. Bush conveyed to his other son, the appellee S. C. Bush, the rest of the tract, comprising about 70 acres. The brothers, to keep their cattle separated,

erected fences approximately following the boundary between their tracts. The present controversy involves only the east-west fence along the north line of the appellee's 70 acres, the boundaries of the ten-acre parcel not being in dispute.

The Bush brothers occupied their respective tracts until Bob's death in 1969. A controversy about the boundary line soon arose between the appellee S. C. Bush and the appellants, C. K. Fish, Jr., and his wife, who acquired the Bob Bush land in 1970. The Fishes filed this suit to quiet their title to all the land north of the fence, relying upon the theory of title by acquiescence. The appellee filed an answer and counterclaim disputing the fact of acquiescence and asking that the line be fixed in accordance with a survey made by I. W. Guthrie. The chancellor, as we have said, fixed the line a few feet north of the fence.

The parties are not basically in dispute about the principles of law governing a boundary by acquiescence. The basic question is one of intention: Did the adjoining landowners mean to recognize the fence as the boundary? The controlling distinction was clearly stated by Justice Bohlinger in *Carney* v. *Barnes,* 235 Ark. 887, 363 S.W. 2d 417 (1962): "The case hinges on whether or not the old fence and the fence row was an agreed line between the two pieces of property. While the construction and maintenance of a division fence, when mutually regarded as a boundary, may constitute recognition and acquiescence, mere existence of a fence between adjoining land owners is not of itself sufficient. There must, therefore, be a mutual recognition of the fence as the dividing line."

The chancellor's rejection of the theory of acquiescence is, in our opinion, supported by the weight of the proof. The appellee, who alone had first-hand knowledge of the agreement between him and his brother, testified that the fence was not intended to represent the boundary. The brothers built the fence, as a joint effort, for the sole purpose of keeping their cattle apart. They had had the land surveyed, but they did not think the survey to be accurate, as the retired surveyor who did the work kept running to the right and to the left, and missed a corner by 20 feet.

The brothers decided to put the fence up as a temporary division until an accurate survey could be had. That the fence was not meant to be the permanent line is confirmed by the fact that it was not straight, being nailed to trees at many points. Allie Rogers, who helped build the fence, corroborated the testimony of S. C. Bush, as did Bush's wife and his sister. There was testimony to the contrary, principally that of Bob Bush's widow. Upon an issue that essentially narrows down to a question of credibility, we cannot say that the chancellor's decision is against the preponderance of the evidence.

Upon the second point, the appellants conclude their brief by asking that the case be remanded "to have the parties offer sufficient evidence to determine the true and correct boundary by a surveyor." Such a remand is not a matter of right. Occasionally we do send an equity case back for additional proof when there is justification for a deficient record. For instance, we followed that course in *Hutchison* v. *Sheppard,* 225 Ark. 14, 279 S.W. 2d 33 (1955), because an important question of fact had been overlooked by all the parties both in the trial court and here. Our general rule, however, is not to allow cases to be tried piecemeal. *Edwards* v. *Johnson,* 227 Ark. 345, 298 S.W. 2d 336 (1957). Absent special circumstances, "it is not our practice to prolong litigation by affording an opportunity for the taking of proof that should have been introduced before the parties rested their case." *Upshaw* v. *Wilson,* 222 Ark. 78, 257 S.W. 2d 279 (1953).

Here we find no special circumstances to justify a piecemeal trial of an issue that was clearly recognized by the pleadings and the proof. By counterclaim the appellee asked that the boundary be fixed according to Guthrie's survey. The appellants disputed the accuracy of that survey; so the point was at issue.

At the trial Guthrie's testimony made a prima facie case for the appellee. Actually the appellants' own surveyor, Thurman, corroborated much of Guthrie's testimony. Both expert witnesses accepted the fence along the south boundary of the quarter section as the true line. Both men relied upon an ancient iron stake to fix the northwest corner of the quarter section. In fact, that point could have been fixed a few feet farther north, at a fence; but

the appellants are not in a position to complain, for they were awarded that overage and thus received more than half of the quarter section.

Guthrie found another ancient iron stake at the northeast corner of the quarter section, which he considered to be correctly placed. Thurman did not find that stake, perhaps because he determined the east boundary by running north from the northwest corner of the ten-acre tract instead of along the east boundary of the quarter section. Even so, Guthrie found the eastern boundary to be 2,675.8 feet long, while Thurman, starting at the same fence on the south, found it to be 2,677.5 feet long. Thus the difference between the two half-mile lines was less than 24 inches.

The appellants' request for an opportunity to adduce additional proof really rests upon the inability of either Guthrie or Thurman to declare with absolute certainty that the fences and stakes upon which they relied conformed exactly to the original Government survey. Yet opposing counsel could not have interviewed their own expert witnesses before the trial without knowing of that uncertainty. The trouble was that the quarter section, as enclosed by fences, contained slightly more acreage than the Government survey called for. Both surveyors stated that it would take a great deal of additional work to determine where the overage came from. In fact, the appellants' surveyor, Thurman, doubted his own ability to make that determination.

The chancellor fixed a line bisecting the quarter section as evenly and as fairly as the proof permitted. Counsel apparently introduced all the evidence that they thought to be necessary. No request for an additional survey was presented to the trial court. See *Garren* v. *Kelley*, 249 Ark. 906, 462 S.W. 2d 861 (1971). We are unwilling to prolong this litigation by remanding the cause for further proof that could have been offered in the first instance (if it is actually available) and that would in all probability demonstrate at most only a slight variation from the line fixed by the chancellor.

Affirmed.