210 Ark. App. 86

**Troy STEELE & Shirley Steele, Appellants**

v.

**David BLANKENSHIP & Mary Blankenship, Appellees.**

No. CA 09–797.

Court of Appeals of Arkansas.

Jan. 27, 2010.

Joseph David Zurborg, Springdale, for Appellant.

DAVID M. GLOVER, Judge.

This is a fact intensive adverse-possession action between appellants, Troy and Shirley Steele, and appellees, David and Mary Blankenship, who own adjacent properties. Appellees filed an action to quiet title to .95 acres lying between their eastern boundary and appellants' western boundary, claiming that the land belonged to them under the theory of adverse possession.[1] After taking the matter under advisement, the trial court found that the disputed property had been adversely possessed by appellees and quieted title in them. Appellants now appeal, arguing that the trial court's decision was clearly erroneous and that the decree quieting title to the property in appellees should be reversed. We affirm the trial court's decision to quiet title in the Blankenships.

*The Testimony*

At trial, Alan Reid, a land surveyor, testified that he had performed a survey for the Blankenships on their eastern boundary in 2000; that they wanted to know the relationship between that boundary and an old fence line over a portion of their property; and that their concern was the relationship between the deed line and the fence line so they could get an approximate idea of how much land was between those two points. Reid said that the width between the deed line and the fence line ranged from ten to fifty feet, but that unless you were looking for the fence it was hard to find at times. He said that portions of the fence were on the ground, but that there were places that the fence was very visible, and that if you knew what you were looking for, you could find wire running through the trees. According to Reid, he saw no evidence of farming, gardening, or grazing, and that because of the rock croppings, it would be difficult to run a fence and fence posts exactly along the deed line. It was Reid's opinion that the fence line was from the mid-twentieth century.

Otto Moos testified that his home abutted the Blankenship property, and that he had walked the fence line sometime in the 1980s. He testified that he had seen the Blankenships working on the property, and he had seen them cleaning out a portion of the fence line two or three times a year for four or five years, although for the last few years the fence line had been

---

1. The Blankenships filed suit against the Steeles and Rick Evans, another land owner, but Evans did not appear at the hearing in circuit court, and he has not appealed the decision.

overgrown. He said that he had also seen the children picking up trash. Moos stated that he had seen the Blankenships clearing a little bit of the ground using a brush hog and tractor and also picking up trash that people had thrown out on the blacktop. Moos said that he had actually walked the fence line, and that the fence had been there long before he was there.

Laura Davis, Mary Blankenship's mother, testified that she had been familiar with the Blankenship property since the time she had married her husband, which was about sixty-five years ago; that she hiked the property lines with her husband and her mother-in-law, who had owned and lived on the property with her father-in-law; and that her in-laws had moved to the property in the 1930s. Her father-in-law died in 1945, and her mother-in-law died in 1982 or 1983. Davis said that she and her husband visited the property at least once a year; that she was familiar with the fence line from hiking the area many times; and that the eastern fence line had been there as long as she could remember. Davis stated that after her mother-in-law's death, the land was sold to Mary and David Blankenship, and that while Mary and David did not live there, they came back to visit often and vacationed and camped on the property. Davis said that she saw David and Mary working the fence line on the east side, and that after they moved there, they worked on the fence maybe twice a month or more on weekends; however, on cross-examination, she admitted that she never actually saw them working on the east boundary fence line, but she did see them hauling in fencing on a regular basis to work on the fence. She testified that she had seen David and his son setting poles and fence and barbed wire in November and December 2007 and January 2008. She said that since David and Mary had moved back, she had hiked there probably once a month, and that when she hiked, she did not leave litter and tried to leave no trace that she had been there.

Upon examination by the trial court, Davis said that she could not say that she was aware of the fence line between getting married in 1943 and her father-in-law's death in 1945. She said that her mother-in-law moved off the property eight to ten years before she died, but that she continued to go out to the property. Davis did not know who tended the fence line from 1972 or 1974 until Mary and David bought the property, and she said that the first time she saw Mary or David doing anything in the fence line was after David's retirement about fourteen years ago. She admitted that the old fence line was "up and down," and that when she saw her family do fencing, they were building in the same line as the old fence.

Joseph Blankenship, Mary and David Blankenship's twenty-four-year-old son, testified that he had been familiar with the property since he was six years old. He said that before they moved back, the family would visit and camp on the land frequently. Joseph testified that he remembered being shown the fence line at the age of six or eight and being told that he could not go past the fence because it was off their property. He said that before they lived there, they did nothing in the disputed area except walk and do minor tree and brush cleaning. Joseph said that when they moved back, the visits to the land became more regular, and around 2002, they really began putting up the fence and maintaining it. He said that before the fence was finished, part of the fence was bulldozed down and some of the posts were stolen. He said that in August 2008, the eastern boundary fence was probably half new fence over existing fence. Joseph also testified that he had

played paint ball in the area in question within the last two years, cut wood in that area, and walked the fence line when he went on nature walks.

Mary Blankenship testified that they bought their property in 1988; that she was familiar with the property prior to purchasing it; that she would come to the property to visit her grandmother; and that she also visited the property and stayed in the log cabin located there after her grandmother moved. Mary stated that her father noted in a survey he performed himself in 1976 that the deed line and the fence line did not match, and that she knew it as well; however, after the property was surveyed, her father continued to use the property to the fence line. She said that the area in dispute was about the "most impossible" area to get to because there was no road from the blacktop, and that because it was steep and wooded coming down the hill, what little her husband had managed to do required that he haul fencing materials in himself. She said that the area in dispute was not their sole focus, and that other than her husband working on the fence and the family going on nature walks, they did not otherwise use or visit the disputed area. Mary testified that they never crossed the fence line.

Mary testified that she and David had paid taxes on the property since they bought it. She said that she knew there was a dispute when they saw the deer feeder on the disputed property, and that they were aware of the survey and had seen pink ribbons in the trees. She introduced pictures that showed the new fence posts that her husband had erected, as well as a photo showing the old fence line and old posts, and the wires going through a large tree up the bluff.

On cross-examination, Mary admitted that some of the fencing was on the ground, and that there were gaps in the fence that could be walked through. She said that other than hiking and some fence repair, she had no other use for the disputed property because it could not be gardened, and they were not running livestock. She said that there were no paths or trails along the fence line where they hiked, but that sometimes she would bring clippers and cut the briars.

Troy Steele testified on his own behalf that he had purchased his property about four-and-a-half years ago and that he was building a house on his property that overlooked the Blankenship property. He said that he had walked the fence line to the north end of his property and had also walked the deed line, and that he was familiar with the property in dispute. Steele said that he had installed a deer feeder in the middle of the disputed area, and that until he received a note from David Blankenship in November 2007 and saw some metal posts Blankenship had set, he had never seen anyone on the disputed property, and there was nothing to give him any indication that other people were using the property between the deed line and the fence line. Steele said that the fence was old and deteriorating; that he had not seen any of the repairs testified to by Mary Blankenship when he walked the fence line; that there were areas where there was no fence, where the fence was not on posts, and only a small area where the fence was in "decent" condition; and that it did not appear that there had been any repairs made to the fence line within the last ten years. Steele testified that he had cleared briars in the disputed area before putting up the deer feeder, and that he had cut firewood there prior to that. He said that he had removed fencing along the boundary line in January, shortly after talking to Mary Blankenship.

Ronald Isles, a neighbor of Steele, testified that he was familiar with the land involved in the lawsuit and, that for about three years, he had not seen any form of activity on the property except Steele filling up the deer feeder. Isles stated that the property was rugged and that it was difficult to put a fence in a straight line. He did not think that there was enough fencing to constitute a line, and he said that the only fencing he was aware of was old, not new.

In rebuttal, Mary Blankenship testified that she remembered talking to Steele, but that they did not talk about the disputed property. She disagreed that, other than 100 feet, the fence was down, and said that her husband had attempted to preserve the old wire because it marked the old boundary.

### The Ruling

After the hearing, the trial court took the case under advisement and issued a letter opinion. In that opinion, the trial court found that the Blankenships purchased their land from Mary Blankenship's relatives by deeds filed December 7, 1998, and that it was not disputed that the Blankenships were in possession of their property and had paid the taxes on the property since that time.

The trial court further found that Mary Blankenship's relatives, beginning with her grandparents, owned the property now owned by Mary and David since 1931, and that the undisputed testimony of Laura Davis, Mary's mother, established that when she first visited the property in question about sixty-five years ago, there was a fence along the "disputed area"; that she had visited the property at least once a year since that time and hiked the fence line on a regular basis; and that the fence was there on each occasion. The trial court also found that Mary's father performed an informal survey of the property in 1976 with appropriate surveying equipment and found that the deed description and the fence line did not match.

The trial court noted the testimony of Joseph Blankenship, who testified that he was told not to cross the fence line, as he would be on other people's property. Joseph remembered helping his parents clean the brush along the fence line in his younger years, and he testified that as a young adult, had helped his father repair some of the existing fence line. The trial court found that the evidence established that since the family had moved back in 1996, they had continued to walk the fence lines, that Joseph and his friends played paintball within the last two years, and that the family had continued to camp in the area close to the fence. The trial court further found that due to the rock outcroppings in much of the disputed area, both sides agreed that it would be impossible to brush hog along the entire fence line on either side.

The trial court found that the Steeles purchased their property about four-and-a-half years before the legal action; that Troy Steele had been on the property almost every day for at least the past two years while building a house; and that Steele testified that much of the fence was on the ground, with only seven or eight standing posts, that the fence was old and deteriorating, and that he had seen no repairs. The trial court noted that Ronald Isles's testimony confirmed Steele's testimony that Steele was on his property once a day; that the terrain in the disputed area was rugged; that there was rusted barbed wire on the ground; and that Isles had never seen any activity in the disputed area and had not noted the fence along the road, although he did not deny its existence.

The trial court found that the exhibits established that there was some upright fencing, some fencing growing through the trees, some new fence posts, some barbed wire partially on the ground, and some clearly visible fencing along the roadway. The trial court also found that the evidence established that one or two years ago, after a discussion with Mary Blankenship, Steele erected a deer feeder; the Blankenships asked him to remove it from "their" property; and that Steele, after recognizing that a dispute existed, bulldozed some of the fence work.

The trial court found that for at least the last sixty-five years, the Blankenships and their predecessors in title had considered the fence to be the boundary line, even though they knew it did not match the property-line descriptions; that they had possessed the disputed area by maintaining the fence, using the property for camping and hiking, cleaning the brush in the fence line, and removing fir trees from time to time; and that this activity had been continuous for over sixty-five years. The trial court found that the Blankenships and their predecessors in title had the necessary intent to adversely possess the property because since 1976, when Mary Blankenship's father performed the informal survey, they knew of the contradiction between the survey and the deeds and continued to possess the property.

The trial court found that fencing or maintaining a fence was an act of ownership evidencing adverse possession; that the fact that the fence may have been degraded did not necessarily mean that the property was no longer enclosed; and that the fence in this case was visible enough so that all parties knew of its existence when they purchased their property. The trial court determined that the area was enclosed, so that the Blankenships' possession of any part, and that of their predecessors in title, was also constructive possession of the entire area; that the possession was inferred by the maintenance of the fence, improvements made to the remaining area of the enclosed land, and mowing and clearing where they could; that the Blankenships' actions were open and notorious; and that they had actually possessed the property in question. The trial court further found that while Steele claimed that he never saw the Blankenships performing any activities on the disputed land, a landowner had a duty to keep himself informed as to the adverse occupancy of his property, and that the visible fencing along the roadway was sufficient to put Steele on notice to investigate adverse possession of his property. The trial court determined that the Blankenships' period of adverse possession was concluded prior to the Steeles purchasing their property and quieted title in the Blankenships.

### Standard of Review

Equity cases are reviewed de novo on the record, and the appellate courts do not reverse the trial court's findings of fact unless they were clearly erroneous. *Boyd v. Roberts,* 98 Ark.App. 385, 255 S.W.3d 895 (2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Ward v. Adams,* 66 Ark.App. 208, 989 S.W.2d 550 (1999). In reviewing a trial court's findings of fact, the appellate courts give due deference to the trial court's superior position to determine witness credibility and the weight to be accorded their testimony. *Boyd v. Roberts, supra.*

### Discussion

On appeal, the Steeles argue that the trial court was clearly erroneous in its

finding that the Blankenships adversely possessed the property in question and that the decree quieting title should be reversed. We disagree.

▮ To prove adverse possession, there are six distinct and necessary elements that an adverse claimant must show before that possession ripens into ownership—the possession must ⌐₁₁be (1) actual; (2) visible and notorious; (3) distinct and exclusive; (4) of a hostile character; (5) accompanied by an intent to hold adversely against the true owner; and (6) for a period of seven years' continuous duration. *Clark v. Clark,* 4 Ark.App. 153, 632 S.W.2d 432 (1982). The *Clark* court addressed each factor in greater detail:

The first five elements deal with the required nature and extent of the possession. Proof as to those factors may vary and must be measured by reasonable view as to the location and character of the land itself. It is ordinarily sufficient if the acts of ownership are of such a nature as one would exercise over his own property and would not exercise over that of another. The act must amount to such dominion over the land as it is reasonably adapted to and under circumstances as would put the true owner on actual or constructive notice of an adverse claim. Those acts of control which might constitute efficient dominion and notice as to one tract might not be held sufficient in another case.

The extent of required possession also may vary in accordance with the circumstances. One who enters adversely under color of title and actually possesses any part of the tract is deemed to have constructive possession of the entire area described in the document constituting color of title. Where one enters adversely upon an enclosed tract his possession of any part thereof is con-

structive possession of the entire enclosure.

. . .

However, the sixth element permits no variation. The adverse possession must be maintained for a period of seven full, consecutive years. To constitute effective adverse possession the possession must be continuous for the full period. If there is a break in the continuity of the adverse holding the period of limitations begins anew.

*Clark,* 4 Ark.App. at 159–60, 632 S.W.2d at 436–37 (citations omitted). Whether possession is adverse to the true owner is a question of fact. *Ward v. Adams, supra.*

Under their point on appeal, the Steeles discuss five subpoints, all of which they contend that the trial court used to determine that the Blankenships had adversely possessed the disputed area.

⌐₁₂**Hiking.** The trial court noted that for sixty-five years, Mary Blankenship's mother, Laura Davis, had visited the property at least once a year and hiked the fence line on a regular basis, and that the Blankenship family had walked the fence line since 1996. The Steeles argue that unless they just happened to be present along the fence line and the disputed area on one of the intermittent hikes, they would have no way of knowing that anyone had been hiking because of the "leave no trace" standard employed by Davis and the Blankenship family and by the lack of any trails in the disputed area.

**1976 Survey.** The Steeles argue that there was no testimony that the results of the informal survey were ever communicated to the adjoining landowner regarding the discrepancy between the deed line and the fence line, that the discrepancy was only discussed among the Davis and Blankenship families. The Steeles argue that even though Mary Blankenship testified that after the survey her father con-

tinued to use the property to the fence line, there was no testimony or evidence as to what that use was so as to determine if the adjoining landowner should have been put on notice that there was an adverse claim to the disputed area up to the fence line.

**Camping.** There was testimony that during the last eighteen years, the Blankenship family had camped on the land for a week at a time. However, the Steeles argue that there was no testimony that the camping occurred in the disputed area, and that Mary Blankenship had testified that other than working on the fence and taking nature walks, there was no other use or visiting up there.

**Removing brush and trees.** The Steeles argue that Joseph Blankenship's testimony that his parents cleaned up small amounts of brush was insufficient to indicate that such cleaning changed the nature or character of the disputed area so as to put the adjoining landowner on notice that the property was being adversely claimed. They also point out that there was no testimony that any trees removed were on the fence line.

**Fence-line repair and paintball.** There was testimony that in 2002, David and Joseph Blankenship repaired some of the existing fence line and that since 2007, Joseph and his friends had played paintball near the fence. The Steeles argue that consideration of these activities by the trial court was improper because the Blankenships filed their petition to quiet title on August 29, 2008, and that neither activity had been going on for the requisite seven years to constitute adverse possession.

We do agree that the trial court improperly considered the paintball sessions and the fence repair, if considered in isolation, as those activities clearly had not been being performed for the requisite

seven years. Likewise, intermittent camping, hiking, and brush clearing, considered by themselves, generally are insufficient to lay a claim to the property by adverse possession. However, on the evidence, we hold that the trial court's decision was correct.

The trial court found that the area was enclosed by a fence. Fencing the disputed area is an act of ownership evidencing adverse possession, and the fact that the fence may be degraded does not necessarily mean that the area is no longer "enclosed"; the question is whether the enclosure is sufficient to "fly the flag" over the land and give notice to the true owner that the land is being adversely claimed. *Boyd v. Roberts, supra.* Where one enters adversely upon an enclosed tract his possession of any part thereof is constructive possession of the entire enclosure. *Clark, supra.* "Where a landowner is under a belief that he owns certain lands enclosed with his owns lands and he exercises dominion over a portion of the enclosed lands adversely to the record owner for the required statutory period of time (seven years) such constitutes an investiture of title to the entire tract." *Kieffer v. Williams,* 240 Ark. 514, 517, 400 S.W.2d 485, 487 (1966). Following the 1976 survey of the fence line, the appellees' frequent acts of camping, hiking, and brush clearing, considered together, support their asserted belief that they owned the lands within the fenced area for the required statutory period of time. Furthermore, a landowner has a duty to keep himself informed as to any adverse occupancy of his property. *Boyd v. Roberts, supra.* Because the land in dispute had been enclosed for at least sixty-five years, the statutory seven-year period for adverse possession had been met long before the Steeles purchased their property. We cannot say that on this set of facts the trial

court's decision to quiet title to the disputed area was clearly erroneous.

Affirmed.

GRUBER and BROWN, JJ., agree.