2011 Ark. App. 197

**Keith BURNS, Appellant**

v.

**Milton R. STEWART & Verna Jo Stewart, Co-trustees for the Stewart Trust, Appellees.**

**No. CA 10-678.**

Court of Appeals of Arkansas.

March 9, 2011.

Denny Paul Petty, Searcy, for appellant.

George Frank Carder, III, Searcy, for appellees.

DAVID M. GLOVER, Judge.

 This appeal involves approximately five-plus acres of rural lands. Appellant

Keith Burns[1] appeals from the order of the trial court quieting title in appellees Milton and Verna Stewart and the Stewart Trust, and denying Burns's counterpetition to quiet title. Burns contends that he proved both a boundary by acquiescence and title by adverse possession to the lands and that the trial court's rulings to the contrary are clearly erroneous. We disagree and affirm.

The facts and legal issues are straightforward. The parties own lands on either side of the section center line. The disputed lands, 5.9546 acres, lie west of the center line and are bounded by a fence on the western edge. By stipulation, four deeds among the parties, none of which contained metes and bounds descriptions of any lands conveyed, and two surveys—one of the lands on either side of the center line—were introduced.

The case, though, turns on the testimony of three witnesses: appellant Burns, appellee Stewart, and Jerry Jackson, Burns's predecessor in interest.

Some facts are undisputed. Stewart first owned the lands east of the center line when he was nineteen but sold the lands to his distant uncle (Roy McInturff) the following year. McInturff "strung a fence down through the woods," which is the fence involved in the dispute in this case. Photos of the fence attached to trees were introduced. Stewart later bought the lands west of the center line, which include the five-plus acres in dispute here. In 1972, McInturff deeded the lands east of the center line to Jerry Jackson. Then, in 2003, Jackson conveyed the same lands to Burns. Jackson testified that he thought he had his property surveyed right after he bought it but that he could not find the survey now. Jackson identified a 1987 survey he later had prepared, a copy of which Burns and he agreed was delivered to Burns at the time of sale of the lands to Burns in 2003. The survey stated that fences are generally meandering around the property line. The surveyor's certificate on the plat stated that the plat was prepared from existing monuments, improvements are as above, and there were no encroachments onto the surveyed tract. The remaining survey was prepared in 2007 at the request of Stewart before this litigation. It was of the 5.9546 acres and was prepared after words were exchanged between Stewart and Burns concerning the boundary line between their adjoining lands.

The use of the fence over the years and the parties' intentions regarding the fence were developed by disputed testimony from the three principal witnesses. First, Stewart stated he owned the lands west of the center section line at the time his distant relative originally installed the fence in 1962 or 1963, as well as when the fence was later repaired. He did not give permission to build the fence but did not object either because it was his uncle. The fence helped him in keeping his cattle enclosed. He had a couple of conversations with Jackson after Jackson bought the lands from McInturff in which he explained that the fence line was not the boundary line. According to Stewart,

1. Burns bought his property with Peggy Simpson Carner; she was named as a codefendant in the quiet-title action brought by the Stewarts. However, Carner quit-claimed her interest to Burns in March 2006, before the lawsuit was filed. Although Carner was served with the Stewarts' complaint, she did not answer or appear. Testimony and evidence established that she had no ownership interest in Burns's property and therefore would have no interest in the outcome of this litigation whether in the complaint or counterpetition. Thus, the order on appeal has adjudicated all claims, rights, and liabilities of all parties and is final for purposes of appeal.

Jackson agreed that the fence was not the line and the parties further agreed Stewart would put up a new fence, if any, which wasn't done because of lack of money (for a survey to know where the boundary line was actually located). Jackson was Stewart's neighbor for thirty-one years (1972–2003), during which time the fence was used as a restraining fence. In 2004, shortly after Burns bought the lands, Stewart told Burns the fence was not the boundary line; that it was not straight; and that a crooked fence cannot be a survey section line. When Stewart had the disputed lands surveyed in 2007 and found out where the quarter section line was, he told Burns he wanted to put a fence on the surveyed boundary line. Further, when the issue arose for Stewart concerning Burns's claims to the disputed lands, he then asked for and obtained from Jackson a quitclaim [4]deed (with a metes and bounds description of the 5.9546 acres enclosed by the old fence line) relinquishing any claims to it.

Next, Mr. Jackson acknowledged that he bought his lands in 1972 and sold them in 2003. Jackson said McInturff was elderly and did not show him the lands. He assumed the fence was the boundary line and labored under that misconception for about a year. Then, Stewart told him the fence was not the boundary line. Jackson confirmed in court the discussions between Stewart and him about the fence not being the boundary line. He recalled that Stewart came to him within a year of when he purchased his lands and told him that part of the lands on the east side of the fence were his (Stewart's). Jackson said he told Stewart that was fine and if he wanted to move the fence he could go ahead and do that. According to Jackson, he did not worry about it because the land was not worth that much. Wherever the boundary line was, it was okay with him. Also, according to Jackson, neither he nor Stewart intended to move the property line. He used the land all the way up to where the fence was and let others do the same for the thirty-one years that he owned it. Jackson stated that, at the time Stewart first approached him, he had "either seen a survey of it or a map some place" that showed it as a straight line. Jackson identified his own 1987 survey of his lands and said he conveyed his lands by deed to Burns with the description being the lands lying east of the property line. Jackson testified that he made no adverse, notorious claims against Stewart for rights to the lands lying west of the center section line. Jackson remembered that he did not walk the lands when he sold to Burns but that they did drive over to the fence line. Responding to the court's questions, he stated that he did not [5]represent to Burns that everything east of the fence line was his; that what he told Burns was that the fence was not the property line; and that it belonged to Stewart.

In his testimony, Burns identified the eighty-three acres he acquired by deed from Jackson. In contrast to Jackson's testimony, while stating that Jackson did not view the property with Burns and Peggy Carner, Burns said that Jackson did describe it as fenced. Burns also identified his realtor as telling him the lands were totally fenced. Burns recalled that he, Peggy, and his father and stepmother all walked the lands with Jackson on another occasion before his purchase, at which time they all heard Jackson tell them the lands being sold were totally fenced and included the fence. (None of these persons testified at the trial.) Burns confirmed that Jackson showed him the 1987 survey and that he (Burns) relied on the surveyor's certification. Burns confirmed that when Stewart came to him within a month of his purchasing the lands and told him the fence was not on the line,

he countered to Stewart that he bought the lands with the fence. Burns then took photos of the fence, which were introduced. Burns also stated that Jackson had never disclosed any dispute with Stewart over the property line or that the fence was not the property line, but had Jackson done so, the sale would have stopped right then.

After the parties rested, the trial court explained its decision. It stated that the first thing of importance in analyzing the case was determining what Jackson owned because he could only sell what he owned; although he could tell somebody that he was selling more than he actually owned, thereby defrauding them, Jackson could not actually sell more than he owned. The trial court stated that Jackson's and Milton's testimony was undisputed that Jackson had not been adversely possessing the property since 1972; that McInturff might indeed have had a claim for title by virtue of adverse possession, and if McInturff had conveyed the lands to somebody, there might be a viable lawsuit based on adverse possession (of the five-plus acres in dispute), but there was no evidence that McInturff conveyed anything but the description in the warranty deed. So by virtue of the deeds, McInturff conveyed only the eighty-three acres. The trial judge then summarized his adverse-possession analysis as follows: "Jackson says hey, that's all I claim I owned was the eighty-three acres. And based on that, I don't see—I'm going to—I'm going to find that this is no sufficient evidence to establish any kind of ownership in Mr. Keith Burns to anything other than what's in the description." The trial judge went on to say: "I've heard testimony about what was represented to [Burns], and my decision is not based on that. It's strictly based on Jackson couldn't sell what Jackson didn't own." The trial court next explained that it did not see any acquiescence either.

Again quoting the trial judge, "I mean, we've got Jackson saying I wasn't claiming it by—I just was using what I was using.... Well, acquiescence would require that they both agreed that the line indeed was the boundary line. And I've got Mr. Jackson saying I wasn't claiming it. It was convenient to me, but I wasn't claiming it."

[COUNSEL FOR BURNS]: Mr. Jackson didn't know where the boundary line was and testified to that. What he said was, if Mr. Stewart [Milton] wanted to move what everybody considered to be the boundary line, then he could do it.

THE COURT: No, no, no, no, that's the important part. Everybody didn't consider it. Everybody considered that it was there, but that it was of no significance is what I heard.

Equity cases are reviewed de novo on appeal, and we do not reverse a trial court's findings of fact unless they are clearly erroneous. *Steele v. Blankenship*, 210 Ark.App. 86, 377 S.W.3d 293 (2010); *Clark v. Casebier*, 92 Ark.App. 472, 215 S.W.3d 684 (2005). A finding is clearly erroneous when, although there is evidence to support it, we are left with the definite and firm conviction that a mistake has been made. *Clark, supra*. In reviewing a trial court's findings of fact, we give due deference to the trial court's superior position to determine credibility of the witnesses and the weight to be accorded to their testimony. *Id.*

The erection and maintenance of a fence at or near the boundary line between adjoining landowners is not enough, in and of itself, to establish a boundary line by agreement and acquiescence. *Camp v. Liberatore*, 1 Ark.App. 300, 303, 615 S.W.2d 401, 403 (1981). Rather,

[t]he basic question is one of intention: Did the adjoining landowners mean to

recognize the fence as the boundary? ... The case hinges on whether or not the old fence and the fence row was an agreed line between the two pieces of property. While the construction and maintenance of a division fence, *when mutually regarded as a boundary,* may constitute recognition and acquiescence mere existence of a fence between adjoining landowners is not of itself sufficient. There must, therefore, be a mutual recognition of the fence as the dividing line.

(Emphasis added.) *Id.* (quoting *Fish v. Bush,* 253 Ark. 27, 484 S.W.2d 525 (1972)).

Here, as explained by the trial judge in his comments from the bench, the only real chance for a change in the property line lay with McInturff, but McInturff did not convey to Jackson anything beyond what had been conveyed to him. Moreover, Jackson (Burns's predecessor in interest) testified that he never regarded the fence as the boundary between the two properties. Thus, the trial court had before it testimony from both Jackson and Stewart denying the existence of any mutual agreement to have the fence represent the boundary line between their properties. After reviewing all of the evidence presented to the trial court, we are simply not left with a definite and firm conviction that a mistake was made in finding that Burns did not prove the existence of a boundary by acquiescence.

We also find no clear error in the trial court's conclusion that Burns did not establish adverse possession of the disputed lands. In order to establish title by adverse possession, the person making that claim has the burden of proving that he has been in possession of the property continuously for more than seven years and that the possession has been visible, notorious, distinct, exclusive, hostile, and with the intent to hold against the true owner. *Cleary v. Sledge Props., Inc.,* 2010 Ark. App. 755, 379 S.W.3d 680. The Arkansas General Assembly enacted certain statutory requirements for proof of adverse possession in Act 776 of 1995, now codified at Arkansas Code Annotated section 18–11–106. *Id.* In order for a claimant to establish adverse possession under this law, the claimant must prove color of title and payment of ad valorem taxes, in addition to the common-law elements of adverse possession. *Id.* Adverse possession occurs where possession of specific property is inconsistent with the true owner's rights and is accompanied by certain acts, including hostility. *Id.*

As discussed previously, McInturff would probably have had the best chance of establishing adverse possession, but he did not convey more lands than were conveyed to him. Jackson, McInturff's successor, who sold the same lands to Burns, testified that he always knew that the fence did not represent the boundary line and, based on his conversations with Stewart, he had not claimed anything beyond what had been conveyed to him by deed. There could be no basis for adverse possession based on Burns's occupancy of the lands because he had not lived there the required seven years prior to this action being brought, and neither was there any prior adverse possession upon which he could tack. Consequently, just as with our discussion pertaining to boundary by acquiescence, we are not left with a definite and firm conviction that the trial court made a mistake in finding that Burns did not prove ownership based upon adverse possession.

Affirmed.

VAUGHT, C.J., ROBBINS, GRUBER, and ABRAMSON, JJ., agree.

WYNNE, J., dissents.

ROBIN F. WYNNE, Judge, dissenting.

I respectfully dissent from the majority opinion regarding appellant's claim of a boundary by acquiescence. Despite the testimony from Milton Stewart and Jackson that they did not consider the fence to be the boundary, I am left with a firm conviction that the trial court made a mistake by ruling in favor of Stewart. A boundary line by acquiescence is inferred from the landowners' conduct over many years so as to imply the existence of an agreement about the location of the boundary line. *Hedger Bros. Cement & Materials, Inc. v. Stump*, 69 Ark.App. 219, 10 S.W.3d 926 (2000). It is the agreement and acquiescence, not the fence itself, that controls. *Camp v. Liberatore*, 1 Ark.App. 300, 615 S.W.2d 401 (1981). The intention of the parties and the significance they attach to the fence, rather than its location or condition, is what is to be considered. *Id.* Neither a prior dispute about the boundary line, nor adverse usage up to a fence is required to establish a boundary by acquiescence. *Myers v. Yingling*, 372 Ark. 523, 279 S.W.3d 83 (2008).

This case presents a classic example of actions speaking louder than words. Stewart and Jackson's actions over several decades as neighbors belie their testimony at trial that was self-serving (in the case of Stewart) and to the benefit of a friend (in the case of Jackson). All of the evidence before the trial court showed that both Jackson and Stewart treated all of the land on their respective sides of the fence as their own. Although Stewart claimed at the hearing that he always knew the fence was not on the boundary line, he (1) never moved the fence, which remained in the same location for approximately forty-eight years, and (2) allowed the fence to be repaired. Likewise, Jackson claimed that he never treated the fence as the boundary line; however, he quitclaimed his interest in the disputed property to Stewart, an act that, if the two parties never considered the fence to be the boundary, was completely unnecessary. The actions of Stewart and Jackson clearly demonstrated an agreement between the two of them that the fence would be treated as the boundary between their respective properties. There was no evidence that this agreement changed when Burns purchased his property, as demonstrated by the fact that the fence remained up after Burns moved onto his land. If Stewart's actions regarding the fence line do not qualify as acquiescence, I fail to see what would. I would reverse the decision of the trial court.