GINGLES v. ROGERS.

4-7143                                              175 S. W. 2d 192

Opinion delivered November 8, 1943.

916

*Ernest Briner,* for appellant.

*Kenneth C. Coffelt,* for appellee.

GRIFFIN SMITH, Chief Justice. Alternative questions are presented: First, did Circuit Court err in refusing to transfer to equity the suit Jimmie C. Rogers filed for the purpose of having H. J. Gingles and S. N. Jones ejected from property the plaintiff claimed? Second, (if it should be held the motion was properly overruled) did Gingles meet the burden of establishing his affirmative defense that he had been in possession, holding adversely, for seven years?

Rogers deraigned title from the heirs of J. F. Kennedy, they having, by warranty deed, conveyed to Lura Howard December 31, 1923. Subsequent conveyances by warranty deeds were Howard to Burnsides, Burnsides to Horace Lattin, Lattin to Jackson, and Jackson to Rogers.[1] Property contended for in the complaint was Lots Nineteen and Twenty, Block Sixteen, Hillcrest Addition to the Town of Bauxite. Damages amounting to $250 were alleged.

The answer contained a general denial.[2] Specifically, it was asserted that Rogers did not acquire rights by reason of the Jackson deeds. There was also a denial that the other parties mentioned in the asserted chain had title. As a complete defense Gingles alleged that he took possession of the lots in 1932 and had since been in uninterrupted adverse possession as owner, and that

[1] Burnsides' deed to Lattin was executed November 7, 1928, but not recorded until May 19, 1930. Lattin sold to Jackson Nov. 11, 1936, and the Jackson deeds (there appear to have been two) were dated July 21, 1941, and April 11, 1942.

[2] Gingles was the real party in interest as defendant, Jones having been his tenant.

Jones was his tenant. The seven-year statute was specifically pleaded.

An amendment to the answer alleged that on October 14, 1932, the defendant purchased the property from Junior Fowler and immediately took possession; that in the deed Fowler erroneously described the lots,[3] but the land actually purchased was that in controversy. It was then said: "This court has no jurisdiction to cancel plaintiff's alleged deeds, which are a cloud upon defendant's title." There was a prayer for transfer to chancery and that the deeds be canceled and that title be confirmed in the defendant; also that the defendant have "all proper relief."

It thus appears that Gingles was in possession of Lots Nineteen and Twenty of Block Sixteen; and that in response to the suit in ejectment he first relied upon adverse possession and a denial that Rogers had title; that he subsequently claimed to have purchased the property, but through error the description was of different lots in a different block; that without abandoning his adverse claim, Gingles asserted purchase from Fowler, and that he moved for transfer to chancery for the purpose of having Rogers' deeds cancelled, and that he prayed for "all proper relief."

One seeking to eject another must, of course, bring himself within the rule that, *prima facie*, a legal right to possession of the property must be shown. As was said by Mr. Justice EAKIN in *Wilson and Wife* v. *Springer*, 38 Ark. 181, "In making out title by the party having the onus, he must do so either by force of the statute of limitations, or by showing claim of title from the government, or at least from a source common to both parties, which implies admission of title to that source, on both sides." Rogers purchased from Jackson and deraigned title to Kennedy, whose heirs conveyed to Howard in 1923. But Gingles denied that J. F. Kennedy had title.

---

[3] It was stipulated that the deed record showed a warranty deed from Fowler to J. G. Kelley and H. J. Gingles covering Lots 21 and 22, Block Eighteen, Hillcrest Addition to the Town of Bauxite. It was dated October 14, 1932. July 24, 1933, Kelley quitclaimed to Gingles.

However, the cause went to trial without any objection having been made to the failure of Rogers to deraign title from the government or a common source, and it will be presumed that the exception actually noted went only to the court's refusal to transfer to equity. The order is susceptible of no other construction.

Rogers, basing his rights on the deeds from Jackson executed in July, 1941, and April, 1942, was entitled to prevail at law in so far as the record title was concerned unless Gingles, who had waived his right to require deraignment to the government, or to a common source, could show—and it was necessary that this be alleged— that the Kennedy heirs and those in sequence down to Jackson, or one of them, did not have title. He relied upon a three-pronged defense. Two of them (adverse possession and the weakness of his adversary's title) were essentially of legal cognizance. The third (mistake in description) was equitable. Was the last defense maintainable?

Assuming that Gingles bought of Fowler, there is nothing in the complaint or amendment to show that Fowler ever owned the property; or, conversely, that if he claimed title it would be of such a character as to defeat, at law, the record title asserted by Rogers. Equity jurisdiction to quiet title, independent of statute, is, of course, available to a plaintiff in possession holding the legal title. "The reason," said Mr. Justice Hart in *Gibbs* v. *Bates,* 150 Ark. 344, 234 S. W. 175, "is that where the title is a purely legal one, and some one else is in possession, the remedy at law is plain, adequate and complete, and an action of ejectment cannot be maintained under the guise of a bill in chancery. In such a case the party in possession has a constitutional right to a trial by jury. *Pearman* v. *Pearman,* 144 Ark. 528, (222 S. W. 1064) and cases cited." In the instant case Gingles was the defendant in possession asking transfer to chancery for the purpose of cancelling the plaintiff's deeds as a cloud upon his title. The amendment does not, in terms, ask that the Fowler deed be reformed. If it be conceded that in effect the prayer was broad enough to indicate this purpose, we are then met with the proposition that

if Fowler intended to deed Lots Nineteen and Twenty to Gingles, it does not follow as a matter of law that he owned them, or that his deed beclouded Gingles' title. The suit proper was such a cloud if Gingles owned the lots, but on the face of the record as disclosed by the amendment it was possible for Fowler to have claimed from one source, for Rogers to have claimed as he did, or for Fowler to have sold without having title of any kind. The right to transfer to chancery must be tested by what the pleadings disclose at the time the court acts.

We conclude, therefore, that the court did not err in overruling the motion.

Rogers testified that he contracted in 1936 for purchase of seven lots, including the two in question. Final payment was made in 1941, at which time he received a deed. There were two houses on the seven lots, one being on Lots Nineteen and Twenty, Block Sixteen. When he made his contract with Jackson to purchase, S. N. Jones occupied the house on Lots Nineteen and Twenty and was paying rent to Gingles. Jackson, said Rogers, acquired the property in 1936 by purchase from Horace Lattin and sold it to witness the following day.

Jones testified that he lived in the house on Lots Nineteen and Twenty and had occupied them as Gingles' tenant "seven years in February."[4] Jones' son-in-law, Sam Lattin, lived in the house before witness occupied it. To the best of Jones' recollection, Sam Lattin occupied the property two months—"maybe longer." Jones made the positive statement that "All the time I lived in the house continually—for seven years last February—and paid rent to Gingles." Rogers lived in a house within two hundred feet of the one occupied by Jones.

Sam Lattin testified that he occupied the property "about 1934," having rented from Gingles. He remained there until 1938. Jones "later on" moved into the same house with witness. Witness believed Jim Kesterson was a tenant before he moved into the house in 1934.

---

[4] Rogers' complaint was filed September 9, 1942. Trial was had March 2, 1943. Jones' answer to the question, "How long have you lived on [the property in question?"] and his answer, "Seven years in February," had reference to the month preceding trial in March.

Junior Fowler's testimony was that in 1930 he moved to the property in question, having bought it from Horace Lattin in 1929. The house was occupied by S. N. Jones, who was "put off by the law." He lived there at two different times after buying, then sold to Gingles in 1931. Witness received a deed from Horace Lattin, and, without having it recorded, "turned it over to Mr. Gingles." He did not know what lots the deed called for, but the property claimed by Gingles was pointed out to him. Fowler later testified that he had the deed recorded. S. H. Burnsides had at one time owned the lots and measured them off when witness purchased of Lattin. The property, definitely, was that occupied by Jones at the time of trial and claimed by Gingles, but witness did not examine the deed to see what lots were shown.

Substance of testimony given by Gingles was that he purchased from Junior Fowler in 1931. (The deeds to Lots Twenty-one and Twenty-two were subsequently introduced.) He held [Lots Nineteen and Twenty] continuously, having rented them most of the time, although "there was some little time during the depression they weren't rented, but they were rented ninety per cent. of the time." Fowler lived on Gingles' Tiger Hill farm when he (Fowler) sold the lots to witness. Fowler secured employment at Bauxite: "I had an opportunity to rent the farm, so made a deal with Fowler to move back [on the lots] and did not charge him rent." Witness had two or three tenants on the lots prior to occupancy by Jones: "Some paid rent and some didn't. It was the latter part of 1931, 1932, and 1933. Vacant houses were numerous. I would rather have a tenant without pay than not have a tenant. Really, the first regular paying tenants were Lattin and Jones, but all were tenants of mine and it was definitely understood that I was in possession. Lattin preceded Jones. I have had possession continuously up to the present time."

Rogers, being recalled, testified that he had paid taxes on Lots Fourteen to Twenty, inclusive, since 1936.

Adverse possession for seven years was not established by testimony of S. N. Jones. When Rogers' suit

was filed September 9, 1942, running of the statute was stopped, and seven years did not, according to this witness, accrue until the following February. If Sam Lattin's occupancy as established by Jones is added to the adverse period, the additional two months—or, as Jones expressed it, "maybe longer"—is unavailing, for "maybe longer" is too indefinite, when considered in connection with the period this witness was attempting to establish, to reach back to September of the seventh year preceding the February referred to. Nor are the facts aided by anything Sam Lattin testified to. He claimed to have rented from Gingles "about 1934" and to have remained until 1938. Later, he says, Jones (his father-in-law) moved into the house with him. All the time from 1934 to 1938 he paid rent to Gingles. Testimony of these two witnesses was such as to justify the jury in rejecting either version, or both; and since Gingles was an interested party and his testimony is not treated as being undisputed, it follows that appellant did not meet the burden imposed by his affirmative pleading.

Affirmed.