## Don ENGLAND, Sr.  *v.*  Linda L. EATON

CA 07-700                                            283 S.W.3d 228

### Court of Appeals of Arkansas
### Opinion delivered April 16, 2008
### [Rehearing denied May 28, 2008.*]

*Judith Rebecca Pratt Hass*, for appellant.

*Estes, Gramling & Estes, PLC*, by: *J. Douglas Gramling*, for appellee.

D.P. MARSHALL JR., Judge. This case is a dispute between adjoining landowners about who owns a strip of land. Although Linda Eaton (an absentee landlord) had actually held title to the disputed tract since 1986, Don England believed that the land was his. He had maintained and improved the strip since he bought his adjacent property in 1990. After England had the land surveyed and

---

* GRIFFEN and BAKER, JJ., would grant rehearing.

discovered that he did not own the disputed strip, he brought this adverse-possession suit. Eaton counterclaimed seeking ejectment and damages.

The circuit court, sitting as the trier of fact, split the disputed property. It found that England proved that he had adversely possessed the eastern part of the strip but not the western part. England appeals, arguing that the circuit court clearly erred in splitting the tract at an arbitrary point when his conduct and intent to possess the property on both sides of the court's line was identical. He also argues that the circuit court erred in refusing to find a boundary by acquiescence in the western portion—an argument we do not reach because the circuit court did not rule on it. *Bell v. Bershears*, 351 Ark. 260, 268, 92 S.W.3d 32, 37 (2002). Eaton does not cross appeal. We agree with England's first point: the circuit court clearly erred by splitting the disputed property with an arbitrary line not rooted in the evidence. *Trice v. Trice*, 91 Ark. App. 309, 316, 210 S.W.3d 147, 152 (2005).

Several undisputed facts frame this case. An old shop sits on the eastern portion of the disputed property. Soon after England bought his land, he began using the building. He made significant improvements and additions to the shop and even used it for his business for several years. England also maintained and improved a road that runs all the way through the western portion of the land to the shop on the eastern portion. He built and maintained a gravel parking lot located almost entirely in the western part. England also ran cattle on the western part and, at one point, fenced in some of that property.

Attempting to distinguish England's use of the two portions, Eaton argues that she and her tenants used the first thirty feet of the road to access a warehouse and buildings on her property. Eaton acknowledged, however, that she has never gone any farther down the road and did not know that there was a shop at the end of it. Eaton hired mowers to mow her land. She never told them, however, specifically where to mow nor did she go to the property to see where they had mowed. Eaton remembered making only two visits to the land during the twenty years that she had owned it.

For several years, England had given Eaton's tenants (members of a motorcycle club) permission to park on the gravel lot—in the western portion of the disputed property—during their bike rally. After England had his land surveyed in 2006, when giving the tenants permission to park on the lot, he said that "Linda owns it anyway."

After hearing all of this evidence, the circuit court issued a letter opinion. It concluded:

> [England's] conduct as it at least relates to a portion of the eastern part of the property, which included maintaining the roadway across the property for a period of time, using, maintaining and adding on to the shop building, and filling an area, constituted conduct demonstrating a subjective intent to possess the property adversely. . . . Although the evidence is clear [England] has on occasion possessed the remaining part of the property in question, the proof does not support his claim that such possession was notorious, distinct, exclusive and hostile . . . .

To prove the common law elements of adverse possession, England had to show that he possessed the disputed property continuously for more than seven years and that his possession was visible, notorious, distinct, exclusive, hostile, and with the intent to hold against Eaton, the true owner. *White River Levee Dist. v. Reidhar*, 76 Ark. App. 225, 228, 61 S.W.3d 235, 237 (2001). England openly occupied and maintained both the eastern and western portions of the disputed land. Only three facts of record distinguish the parties' use of the two portions, all of which concern the exclusivity of England's use of the western part: the thirty feet of the road by which Eaton and her tenants accessed their property; England's allowing Eaton's renters to park on the gravel lot in the western portion; and England's statement about ownership.

England conceded Eaton's use of the thirty-foot strip. The circuit court therefore correctly excluded that portion of land from the part that England adversely possessed. But the western portion left in Eaton's possession extended well beyond the thirty-foot strip. The only other use of the western portion by Eaton was her renters' use of the parking lot with England's permission. Permissive use by others, however, does not destroy the exclusiveness of an adverse claimant's possession. *Anderson v. Holliday*, 65 Ark. App. 165, 174, 986 S.W.2d 116, 120-21 (1999).

The *Anderson* case involved permissive use by the public. But as other states have recognized, the principle governs as to those holding record title too. *Almond v. Anderegg*, 276 Or. 1041, 557 P.2d 220 (1976); *Hinds v. Slack*, 293 Ala. 25, 299 So.2d 717 (1974). In *Almond*, for example, an adverse possessor had built a road, and the fact that he occasionally allowed the record owner to use the road did not destroy the adverse possessor's exclusive possession. 276 Or. at 1047, 557 P.2d at 223. The general rule is that, ''[o]ne may be in possession, for the purpose of acquiring land under the

statutes of limitation, although he permits the public to pass over the land, or permits other persons to use the grass for pasturage, or not withstanding occasional trespasses by others made without intent to oust the claimant or assert a hostile claim against him . . .." 4 TIFFANY ON REAL PROPERTY § 1141, 736 (3d ed. 1975). The universe of "other persons" includes the title holder because that person's use—with permission—recognizes the claimant's assertion of exclusive dominion over the property. There was no evidence that Eaton or her tenants intended to oust England by parking in the disputed strip or thereby asserted any right in this property. If Eaton or her tenants had used the western part of the disputed tract without England's permission and because they thought that they were entitled to do so on the strength of Eaton's title, then this would be a different case.

Nor is England's statement about Eaton's ownership con- clusive. He made it, not early in his occupation of the disputed strip, but in the summer of 2006 after his survey had revealed Eaton's record title. This admission weighs in the balance, but it does not outweigh the clear preponderance of all the evidence, which shows England's various actions asserting exclusive domin- ion over the property for the preceding sixteen years.

The line at which the circuit court divided the eastern and western portions of the property was arbitrary. The court drew a north/south line, essentially dividing the disputed property in half. Though the court said that England's activities differed on the eastern and western portions, the new property line has no adequate basis in those actions or the other evidence about the parties' use. England bought his property in two parcels, and the circuit court simply extended the line between those parcels northward. This attempt to do equity was an arbitrary resolution of the parties' dispute.

We are left with the firm conviction that the circuit court clearly erred. *Trice, supra.* Apart from the agreed joint use of the first thirty feet of the road, the court's finding that England's use of the western portion of the disputed tract was not exclusive is clearly against the preponder- ance of the evidence. Ark. R. Civ. P. 52(a). Deferring to the circuit court on credibility, and giving England's admission its strongest pos- sible weight, on the record as a whole this statement standing alone does not undermine England's claim. *Trice,* 91 Ark. App. at 316-17, 210 S.W.3d at 152-53.

We affirm the circuit court's decision as modified and remand. England adversely possessed the entire disputed tract except for the first thirty feet of the western portion. We remand

for a survey and for the circuit court to enter an order thereafter accurately describing the line at which Eaton's thirty-foot strip ends and England's property now begins.

Affirmed as modified and remanded.

PITTMAN, C.J., BIRD, and HEFFLEY, JJ., agree.

GRIFFEN and BAKER, JJ., dissent.

KAREN R. BAKER, Judge. The majority is left with a firm conviction that the circuit court erred in its factual determination that possession of a portion of land was not exclusive to the adverse possessor. They reason that the adverse possessor permitted the record owner's renters to use the disputed area; therefore, the record owner's use of her own property did "not destroy the exclusiveness of the adverse claimant's possession." The case relied upon to support this contention is *Anderson v. Holliday*, 65 Ark. App. 165, 174, 986 S.W.2d 116, 120-21 (1999) (holding that the public's use of the disputed road to access the adverse possessor's business did not destroy the exclusiveness of the adverse possessor's use). Neither this case, nor any other, supports the premise that an adverse possessor has any legal or equitable authority to grant permission to a record owner to use the property titled in his or her name. The majority's reasoning, based upon this underlying assumption, is structurally unsound. Given our standard of review, the trial court's decision should be affirmed.

This appeal is from an order by the Washington County Circuit Court, in a boundary dispute in which appellant Donald England, Sr., sought to quiet title in himself in a strip of land, and appellee Linda L. Eaton counterclaimed seeking ejectment and a writ of possession. The circuit court found that appellant England had adversely possessed the eastern portion of the strip but that appellee Eaton was entitled to possession of the western portion of the strip.

The strip of land in dispute is situated to the north of England's land and is the southern-most part of Eaton's land. In its letter opinion, which was incorporated into its final order, the trial court discussed the evidence and its findings. Included in its evaluation of the claim, the court relied upon the following facts and circumstances, which the evidence supports.

England acquired title to his land by warranty deed on June 30, 1990. Eaton acquired her property by warranty deed on December 5, 1986. England paid the ad valorem taxes on the

property for a period in excess of seven years. England and the witnesses he called in support of his claim testified that from the time England acquired the property in 1990 he had used, maintained, and improved the property and road located within the disputed area. The road is an extension of Fayetteville's 19th Street. England had fenced a portion of the area in dispute in 1992 and ran cattle on that part of the property for two or three years. The fence, which at one time crossed the roadway, was removed in 1999 although remnants of a fence are still present and appear along a part of the north line of the disputed area.

Evidence also established that England first acquired possession of his property in 1989 as a tenant before acquiring title to the real estate. A building known as the shop building was located in the disputed area of the property. England cleaned out the building, concluding this project in the 1990s; thereafter, he used it in conjunction with his trucking business until moving that enterprise to another location on his property in 2001 or 2002. He continued to use the shop and completed an addition to the structure in 2000 or 2001. England also offered evidence that he added fill dirt to an area of the property at issue located behind the shop building.

Appellee Eaton testified that she hired people to maintain her property, that this maintenance included a part of the property now claimed by England, and she paid for mowing part of the property north of England's home. Eaton's tenant, Collin Wilkins, testified that he and the members of his club that rent the structures located on Eaton's property use the western part of the disputed area for the purpose of obtaining ingress and egress to their club building. In addition, he explained that he and members of the club parked vehicles on the disputed property and that England had commented on the parking of the vehicles in the disputed area with the statement, "Linda owns it anyway."

Based upon this evidence, the trial court concluded that England mistakenly assumed that the boundary line was located on the north line of the disputed parcel of property; however, his conduct on the eastern part of the property constituted conduct demonstrating a subjective intent to possess the property adversely. His actions regarding the use of the property included maintaining the roadway across the property for a period of time, filling an area with dirt, and using, maintaining and adding on to the shop building. The trial court further found that the evidence established England's adverse possession of this area for more than seven

years and his possession was visible, notorious, distinct, exclusive, hostile, and with the requisite intent to hold the same. The court's order incorporated a metes and bounds description consistent with a survey plat referenced by England.

The trial court, however, found that the proof did not support England's claim to the remaining part of the property. In challenging the trial court's finding regarding the western portion of the disputed area, England argues that the road he maintained extended from the western boundary and then continued to the shop building located in the eastern part of the claimed area. He focuses on evidence establishing that in 1990 when he first acquired ownership of his property that the road was merely a dirt path, but he created a true and functioning roadbed by adding six inches of slate and six inches of SB2 material and that his expense and effort created an entire roadway capable of supporting large vehicles such as semi-trailers. In connection with the roadway, England built a parking lot located between the home and the shop that lies almost entirely within the western portion of the disputed area. He also repeats the evidence regarding running cattle in the disputed area.

Regarding the road, Eaton responds that the use of the road was not exclusive to England. Eaton and her renters and visitors accessed the rental house and a warehouse by this road. In addition, the club used the western portion of the disputed area at least once a week. England admitted that his use of this area was not exclusive.

The appellate review of an equity matter requires this court to review the cases de novo on the record, and we do not reverse unless we determine that the trial court's findings of fact were clearly erroneous. *Holaday v. Fraker*, 323 Ark. 522, 920 S.W.2d 4 (1996). A finding of fact is clearly erroneous when, although there is evidence to support it, the appellate court is left with the definite and firm conviction that a mistake has been committed. *Id.* Discrepancies in the evidence are matters involving credibility for the trier of fact to resolve. *Robertson v. Lees*, 87 Ark. App. 172, 189 S.W.3d 463 (2004).

Adverse possession is governed by both common and statutory law. To prove the common-law elements of adverse possession, a claimant must show that he has been in possession of the property continuously for more than seven years and that his possession has been visible, notorious, distinct, exclusive, hostile,

and with the intent to hold against the true owner. *Trice v. Trice*, 91 Ark. App. 309, 210 S.W.3d 147 (2005). It is ordinarily sufficient proof of adverse possession that the claimant's acts of ownership are of such a nature as one would exercise over his own property and would not exercise over the land of another. *Id.* For possession to be adverse, it is necessary that it be hostile only in the sense that it is under a claim of right, title, or ownership as distinguished from possession in conformity with, recognition of, or subservience to, the superior right of the holder of title to the land. *Fulkerson v. Van Buren*, 60 Ark. App. 257, 961 S.W.2d 780 (1998). There is every presumption that possession of land is in subordination to the holder of the legal title. *Id.* The intention to hold adversely must be clear, distinct, and unequivocal. *Id.* Whether possession is adverse to the true owner is a question of fact. *Id.*

When evaluating a claim, the fact finder considers that a landowner has a duty to keep himself or herself informed as to the adverse occupancy of his or her property. *See Welder v. Wiggs*, 31 Ark. App. 163, 790 S.W.2d 913 (1990). A landowner's knowledge that another person is in hostile possession of his land may consist of either actual knowledge or constructive notice. *Id.* Constructive notice is that which would reasonably indicate to the landowner, if he visits the premises and is a person of ordinary prudence, that another person is asserting a claim of ownership adverse to his own. *Id.* Fencing the disputed area is an act of ownership evidencing adverse possession. *Boyd v. Roberts*, 98 Ark. App. 385, 255 S.W.3d 895 (2007). The fact that the fence may have deteriorated does not necessarily mean that the property is not enclosed; the question is whether the enclosure is sufficient to put the record title owner on notice that his land is held under an adverse claim of ownership. *Id.*

The evidence supports the trial court's decision on appellant's adverse-possession claim regarding the western portion of the disputed area of the property. England's acknowledgment that the use was not exclusive and the evidence supporting the use of the area by Eaton, her renters, visitors, and the club support the trial court's determination that the use was not exclusive. Because every presumption that possession of the disputed land by appellant was in subordination to appellee as the holder of the legal title, *see Fulkerson, supra,* the evidence also supports the trial court's decision finding that appellant failed to meet his burden of proof regarding his adverse possession claim for the western portion of

the tract. In explaining its reasoning for its findings, the trial court quoted the case of *Dickson v. Young*, 79 Ark. App. 241, 85 S.W.3d 924 (2002):

> The Court there held "the law of adverse possession and specifically the intent required, has often been misinterpreted and misapplied. The question of intent becomes one of nuance in many cases, with hair-splitting terminology deciding the fate of the possessor's claim."

The trial court's awareness of the subtle complexities it faced in reaching its factual determinations led the court to physically inspect the disputed tract twice before making its findings. Ignoring the trial court's first-hand knowledge and our deference to the trial court's perceptions, the majority misinterprets and misapplies the *Anderson* terminology to confuse the concepts of permissive use and exclusivity. The majority's reliance on the case of *Anderson*, *supra*, to support its claim that "mere permissive use will not destroy the exclusiveness of an adverse possessor's claim" is an unacceptable contention. The relevant language from the case provides as follows:

> According to appellants, Gib-Ark and appellees did not exclusively use the property because the public continually drove over the ditch in order to reach the Gibson's store parking lot and, after June 1974, the parking lots of nearby stores. We disagree. The public's use of land that is adversely possessed does not render the adverse possessor's use non-exclusive, so long as the public's use and the adverse possessor's use of the land are not the same. 121 3 Am. Jur. 2d *Adverse Possession* § 79 (1986); 2 C.J.S. *Adverse Possession* § 56 (1972).

*Anderson*, 65 Ark. App. at 173-74, 986 S.W.2d at 120-21.

The *Anderson* court concluded:

> In the case at bar, appellees and their predecessors used the disputed property as an entrance to their property. There was no other business fronting on the property. Although the public traveled across the property and civic organizations used it from time to time, this usage was permissive, not possessory, and did not destroy the exclusiveness of appellees' use.

*Anderson*, 65 Ark. App. at 174, 986 S.W.2d at 121.

In *Anderson*, the customers were merely using the access to the store, not asserting a right to possess the disputed access area. In no way could this use by customers to access a business be analogous to assert possession against the true owner by permitting the true owner to use his or her own property. No permission is required for a record owner to use his or her own property. No legal basis exists to support the contention that an adverse possessor can obtain the authority to grant permission allowing a record owner to use his or her own property.

Even if the majority engaged in hair-splitting terminology to try to distinguish the use of Eaton's renters and visitors as somehow separate from Eaton, the argument would fail because the authority of her renters and visitors to use the property flowed through Eaton's rights of ownership. Our supreme court recently expressed distinctions in the authority granted by landowners to possessors by license or lease:

> There is a marked difference between a license and a lease. Under the lease, the right of possession against the world is given to the tenant, while a license creates no interest in the land, but is simply an authority or power to use in some specific way.
>
> . . . .
>
> A license in respect to real estate is an authority to do a particular thing upon the land of another without possessing an estate therein. The test to determine whether an agreement for the use of real estate is a license or a lease is whether the contract gives exclusive possession as against all the world, including the owner, in which case it is a lease, or whether it merely confers a privilege to occupy under the owner, in which case it is a license. *Id.* at 1046 (citations omitted). However, "[a] license not being assignable, an attempted assignment by the licensee of his rights thereunder has been regarded as bringing the license to an end[.]" Tiffany Real Property, Sec. 837 (2004).

*El Paso Production Co. v. Blanchard*, 371 Ark. 634, 644–45, 269 S.W.3d 362, 371 (2007).

Regardless of whether Eaton's renters and visitors were licensees or lessees, their authority to be on the property owned by Eaton flowed through Eaton to them. Their permissive use of the property could only legally come from the record landowner.

Accordingly, the trial court did not err in finding that England had failed to prove his exclusive use of the disputed tract, and the trial court should be affirmed.

We should also reject England's argument that the parties acquiesced to the road as the boundary. Whenever adjoining landowners tacitly accept a fence line or other monument as the visible evidence of their dividing line and apparently consent to that line, it becomes a boundary by acquiescence. *Clark v. Casebier*, 92 Ark. App. 472, 215 S.W.3d 684 (2005). A boundary line by acquiescence may be inferred from the landowners' conduct over many years so as to imply the existence of an agreement about the location of the boundary line. *Id.* This is a question of fact. *Id.* Here, there was clearly a dispute and there was simply no evidence of a tacit recognition by the landowners that the road was the boundary. In addition, England's comment that the western area of the disputed tract belonged to Eaton directly contradicts the existence of the fence as a recognized boundary agreed upon by the parties.

Accordingly, we should find no error and affirm. I am authorized to say that Judge Griffen joins in this dissent.

GRIFFEN, J., joins.