Cite as 2025 Ark. App. 253

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CV-23-820

| | |
|---|---|
| DOROTHY G. BARTONI REVOCABLE LIVING TRUST<br><br>APPELLANT<br><br>V.<br><br>MVC PROPERTIES, LLC<br><br>APPELLEE | Opinion Delivered April 23, 2025<br><br>APPEAL FROM THE CONWAY COUNTY CIRCUIT COURT [NO. 15CV-21-279]<br><br>HONORABLE DAVID H. MCCORMICK, JUDGE<br><br>AFFIRMED |

**CINDY GRACE THYER, Judge**

This appeal originated as a quiet-title action by appellee MVC Properties, LLC ("MVC"), against the Dorothy G. Bartoni Revocable Living Trust ("Bartoni" or "the Trust") regarding the ownership of a triangular-shaped, 0.18-acre parcel of land in Conway County. The Conway County Circuit Court determined that MVC established the statutory and common-law elements of adverse possession and that title to the disputed property should be quieted in MVC. The Trust appeals, arguing that the circuit court erred in finding that MVC complied with the notice requirements of Arkansas Code Annotated sections 18-60-502 and 18-60-503 (Repl. 2015) and in finding that MVC's proof satisfied the statutory and common-law elements of adverse possession.

I. *Factual and Procedural Background*

The property at issue in this case was originally a forty-acre parcel. In 1935, S.J. and Anna Laux granted the northwest quarter of the northwest quarter of Section Sixteen, Township Six North, Range Sixteen West to Howard and Anna Griffith. In 1963, Anna Griffith conveyed approximately two acres along the northern edge of this forty-acre tract to Mabel and John Bour. The legal description of this two-acre tract was as follows:

> Part of the Northwest Quarter of the Northwest Quarter . . . described as beginning at the Northwest Corner of said [Northwest Quarter]; thence East 400 feet for a point of beginning; thence East 210 feet; thence South 420 feet; thence West 210 feet; thence North 420 feet to point of beginning, containing two (2) acres more or less, in Section 16, Township Six North, Range 16 West.

In 1969, Anna Griffith conveyed the remaining portion of the forty acres to her daughter, Dorothy Bartoni, expressly excepting the two-acre tract conveyed in the 1963 deed to the Bours.[1]

In 1974, the State of Arkansas purchased 5.24 acres from Bartoni in order to create Highway 9, which now runs roughly diagonally, northwest-to-southeast, across the original forty-acre property. A large part of the bottom, or southernmost, portion of the two-acre tract was included in this sale, reducing it to approximately 1.19 acres. This 1.19-acre parcel was referred to throughout these proceedings as "Parcel B." In addition, as a result of the placement of the highway, the upper-left-most corner of the parcel was essentially turned into a small triangle that measures approximately 0.18 acre. This 0.18-acre parcel was referred to

---

[1]Bartoni transferred this property to the Dorothy G. Bartoni Revocable Living Trust in 2016.

as "Parcel A." Parcel A is now bounded by Highway 9 to the south and by Blue Diamond

Drive to the north, and its eastern boundary abuts the western boundary of Parcel B.



In 1991, Mabel Bour deeded Parcel B to herself and Robert Bour. The property

description in this deed was the same as that in the 1963 deed from Anna Griffith to Mabel

and John Bour. In June 2014, Robert Bour, as Mabel's widower, transferred the property to

Delana and Drew Herod by virtue of a warranty deed, which purported to convey both Parcel

B––the remainder of the two-acre tract––and Parcel A. The legal description of the tract in

the 2014 deed was as follows:

> Part of the Northwest Quarter of the Northwest Quarter (PT. NW1/4 NW1/4) of Section 16, T-6-N, R-16-W, Conway County, Arkansas, being more

particularly described as follows: Commencing at the Northwest Corner (NW Cor.) of the NW1/4 NW1/4 of said Section 16 and run thence S 88°52'03" E along the North Line thereof for 400.00' to the Point of Beginning (P.O.B.); Thence continue running S 88°52'03" E along said North Line for 210.00' to a point; Thence run S 01°17'22" W for 330.96' to a point on the Northeasterly Right of Way Line of Arkansas State Highway #9; Thence run along said Northeasterly Right of Way Line the following Bearings and Distances: N 50°23'47" W 226.14' to a Hwy. R/W Mon.; N 35°09'47" W 54.80' to a point; Thence leaving said R/W Line run N 01°17'22" E for 146.10' to the Point of Beginning (P.O.B.), Containing 1.19 Acres.

Part of the Northwest Quarter of the Northwest Quarter (PT. NW1/4 NW1/4) of Section 16, T-6-N, R-16-W, Conway County, Arkansas, being more particularly described as follows: Commencing at the Northwest Corner (NW Cor.) of the NW1/4 NW1/4 of said Section 16 and run thence S 88°52'03" E along the North Line thereof for 292.29' to a point on the Northeasterly Right of Way Line of Arkansas State Highway #9 and being the Point of Beginning (P.O.B.); Thence continue running S 88°52'03" E along said North Line for 107.71' to a point; Thence run S 01°17'22" W for 146.10' to a point on the Northeasterly Right of Way Line of Arkansas State Highway #9; Thence run along said Northeasterly Right of Way Line N 35°09'47" W for 181.28' to the Point of Beginning (P.O.B.), Containing 0.18 Acres

The Herods, in turn, conveyed the same property to MVC in November 2018.

On November 29, 2021, MVC filed its complaint to quiet title, asserting that its property and the Trust's property "overlap in their legal descriptions contained in their respective chains of title" regarding the 0.18-acre portion. MVC asserted that it and its predecessors in title had used and maintained the entire parcel––i.e., the 1.19-acre parcel and the 0.18-acre parcel––by erecting and maintaining a fence, mowing, and clearing brush off the property for more than seven consecutive years. MVC further noted that Bartoni had not used the property for as long as MVC had been in possession of it. Additionally, MVC asserted that the Conway County Assessor's Report reflected that the 1.37 acres was assessed in its name, identified as parcel number 006-03718-000, "being the 0.18 acres . . . and the

4

1.19 acres lying adjacent to the property to the east" on which MVC and its predecessors had paid ad valorem taxes for at least seven years. Accordingly, MVC asked the circuit court to vest title to Parcel A in it.

The Trust initially filed a pro se answer, attaching tax receipts showing that it had paid property taxes on the 0.18-acre parcel since at least 2011. The Trust eventually retained counsel, who filed an amended answer and counterclaim in October 2022. The Trust denied that MVC could prove that it satisfied the statutory requirements for adverse possession. In its counterclaim, the Trust asked the court to declare that it was the true owner of the disputed property.

The circuit court held a bench trial in June 2023. The court heard testimony from Dr. Christopher Magie, the sole owner and president of MVC; Edward Ruff, a nearby business owner; Norbert Gunderman, the Conway County tax collector; Stephanie Cain, of the Conway County Assessor's Office; Gene Ruffiner, Dorothy Bartoni's cousin who leased the property from the Trust and lived on the larger tract; and Spencer Thomas, a professional surveyor who surveyed the property in December 2022.

After considering posttrial briefs,[2] the circuit court issued a letter opinion in which it first determined that the notice requirements of Arkansas Code Annotated section 18-60-

[2]At the end of the trial, the court invited briefing on two issues that had been raised in a motion for summary judgment filed by the Trust shortly before trial, one of which was the issue of whether notice had been properly posted for the quiet-title action pursuant to Arkansas Code Annotated sections 18-60-502 and 18-60-503. The summary-judgment motion itself was eventually dismissed as untimely because it was filed on May 17, 2023, less

503 and the publication requirements of section 18-60-502 did not apply because the dispute was between the owners of two contiguous parcels of property. The court then concluded that "[a]fter reviewing all the evidence and judging the credibility of the witnesses who testified, the court finds that the testimony and exhibits are sufficient to find that [MVC] has established all the elements of adverse possession and that title to the property in dispute should be quieted in [MVC]." The court's order quieting title in MVC was entered on September 8, 2023, and the Trust filed a timely notice of appeal on September 22. It now argues that the circuit court erred in finding that the statutory notice requirements were not applicable and that MVC proved both the statutory and common-law elements of adverse possession.

## II. *Standard of Review*

This court reviews adverse-possession and quiet-title actions de novo on the record and will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Stevens v. Hillenburg*, 2024 Ark. App. 295, 689 S.W.3d 695; *Parkerson v. Brown*, 2013 Ark. App. 718, 430 S.W.3d 864. A finding of fact is clearly erroneous when, although there is evidence to support it, we are left with the definite and firm conviction that a mistake has been committed. *Mehaffy v. Clark*, 2022 Ark. App. 268, at 5, 646 S.W.3d 651, 654.

## III. *Discussion*

### A. Arkansas Code Annotated sections 18-50-502 and 18-50-503

than forty-five days before the trial date in contravention of Arkansas Rule of Civil Procedure 56(b).

Arkansas statutes set out specific procedures for providing notice of quiet-title actions. When a claimant files a quiet-title action, he or she "shall post a notice of the pending quiet title action conspicuously on the property." Ark. Code Ann. § 18-60-502(b)(2)(B). Once a petition is filed, section 18-60-503(a)(1) requires the clerk of the court to "publish a notice of the filing of the petition on the same day of each week, for four (4) weeks in some newspaper published in the county, if there is one, and if not, then in some newspaper having a circulation in the county." The petition "shall describe the land and call upon all persons who claim any interest in the land or lien thereon to appear in the court and show cause why the title of the petitioner should not be confirmed." Ark. Code Ann. § 18-60-503(a)(2).

On appeal, the Trust argues that because MVC never posted a notice of its pending quiet-title action on the property or published the requisite notice in the newspaper, the circuit court lacked jurisdiction over the matter.[3] *See DJS Dev., LLC v. Brawley*, 2022 Ark. App, 199, at 4, 645 S.W.3d 34, 36 ("[W]hen there is no compliance with the statutory notice requirements, the circuit court lacks jurisdiction to adjudicate the rights to the land.").

The Trust relies on *Koonce v. Mitchell*, 341 Ark. 716, 19 S.W.3d 603 (2000), in support of its argument. *Koonce* was, as the supreme court described it, "a bizarre case" in which two parties were litigating over a strip of land, but the record owner of that strip was not a party

---

[3]This is actually the Trust's second point on appeal; however, because it potentially implicates the circuit court's jurisdiction, and thus our appellate jurisdiction, we address it first.

to the lawsuit. The court held that because the record owner was not a party, and because neither party complied with the statutory notice provisions, neither party was able to make a prima facie case to quiet title, and the circuit court lacked subject-matter jurisdiction to adjudicate the rights to the land.[4]

In *Boyd v. Roberts*, 98 Ark. App. 385, 255 S.W.3d 895 (2007), however, this court distinguished *Koonce*. The dispute in *Boyd* was over the location of the true property line between two adjoining parcels, one of which was owned by the Robertses and the other of which was owned by the Winninghams. The Robertses were found to possess the disputed "gap" property because they had maintained it, mowed it, and run horses over it; in addition, they had color of title and had paid taxes on the property for more than seven years. The Winninghams appealed and argued in part that the circuit court lacked jurisdiction to consider the matter because the statutory notice requirements had not been complied with. This court disagreed and held that *Koonce* "has no application where . . . the dispute involves the location of a single boundary between two parcels of land, one of which is undisputedly owned by [one party] and one of which is undisputedly owned by [the other party]." *Id.* at 392–93, 255 S.W.3d at 900. *See also Johnson v. Brasfield*, 2010 Ark. App. 321 (when the only persons claiming ownership of the property were parties to the quiet-title action, the failure to give notice under the statutes did not deprive the circuit court of jurisdiction).

---

[4]*See Gingles v. Rogers*, 206 Ark. 915, 175 S.W.2d 192 (1943) (holding that a prima facie case to quiet title requires a showing that the plaintiff has legal title to the property and is in its possession); *Bullock v. Duerson*, 95 Ark. 445, 129 S.W. 1083 (1910) (in an action to quiet title, the plaintiff has the burden of establishing his or her title to the land).

The Trust nonetheless claims that notice was required in this case because Gene Ruffiner, who leased the property from the Trust, was "not in the chain of title, but he has rights and claims, and he was clearly entitled to notice." It further states that Ruffiner is "an interested party with rights to the land, and he was never made a party to the action." Therefore, it argues that MVC should have complied with the statutory notice requirements.

We disagree. The purpose of section 18-60-503 is to provide notice in cases involving the rights or claims of unknown persons and the rights of known persons who have not been served with process in the action. *Johnson*, 2010 Ark. App. 321, at 4; *Boyd*, 98 Ark. App. at 392, 255 S.W.3d at 900. In *Johnson*, the circuit court found that it lacked jurisdiction over a quiet-title action because the required statutory notice had not been published in the newspaper. This court reversed the circuit court's decision because "the only record owners of the property in question and the only persons claiming ownership of the property were parties to the quiet-title action, both of whom were before the court." *Id.* at 3.

The Trust does not dispute that it was served with process or that it had notice of and participated in the lawsuit. Instead, it insists that Ruffiner was entitled to notice because he had "rights and claims" to the property. Again, we disagree. Although Ruffiner resides across Highway 9 from the disputed parcel on other land owned by the Trust, he is not a record owner of the disputed parcel. As in *Johnson*, the record owners of the property in question and the only persons claiming ownership of the property--MVC and the Trust-- were

parties to the quiet-title action, and both were before the court.[5] Therefore, under *Boyd* and

*Johnson*, MVC's failure to provide the statutory notice did not deprive the circuit court of

jurisdiction.

B. Arkansas Code Annotated section 18-11-106(a)

The Trust's next argument focuses on the statutory requirements for proving adverse

possession. Arkansas Code Annotated section 18-11-106 (Repl. 2015) provides the means

for establishing adverse possession as follows:

> (a) To establish adverse possession of real property, the person and those under whom the person claims must have actual or constructive possession of the real property being claimed and have *either*:

> (1)(A) Held color of title to the real property for a period of at least seven (7) years and during that time paid ad valorem taxes on the real property.

> (B) For purposes of this subdivision (a)(1), color of title may be established by the person claiming adversely to the true owner by paying the ad valorem taxes for a period of at least seven (7) years for unimproved and unenclosed land or fifteen (15) years for wild and unimproved land, provided the true owner has not also paid the ad valorem taxes or made a bona fide good faith effort to pay the ad valorem taxes which were misapplied by the state and local taxing authority; *or*

> (2) Held color of title to real property contiguous to the real property being claimed by adverse possession for a period of at least seven (7) years and during that time paid ad valorem taxes on the contiguous real property to which the person has color of title.

(Emphasis added.)

---

[5]Moreover, although Ruffiner was neither named as a party nor a record owner of the disputed property, he was present at and participated in the trial of the matter. The Trust can hardly be heard to complain that he did not have notice of the proceedings.

At trial, MVC's sole owner and president, Dr. Christopher Magie, testified that he had been paying taxes on 1.37 acres––the 1.19-acre parcel B and the 0.18-acre Parcel A–– since he bought the property in 2014. He had continued to do so even after he found out there was a cloud on the title to Parcel A. Paid tax receipts confirming that MVC had paid taxes on 1.37 acres on property at Highway 9 and Blue Diamond Drive from 2014 until 2021 were introduced at trial. Norbert Gunderman, the Conway County tax collector, confirmed these tax payments. Gunderman also noted, however, that the acreage was changed in 2022 from 1.37 acres to 1.19 acres. Stephanie Cain, of the Conway County Assessor's Office, explained that Parcel A had been shown as part of the MVC property until June 2022 when the Trust's attorney brought in a new survey; after that point, she said, the assessor's office considered Parcel A to be part of the Trust property. Consequently, MVC paid taxes on only Parcel B beginning in 2023.

In addition to the tax receipts introduced by MVC, the Trust also introduced copies of paid tax receipts showing payments it made on parcel number 001-04617-000, a total area of 32.76 acres, between 2011 and 2020. Aerial maps from the assessor's office's computer system, ActDataScout, included Parcel A as part of parcel number 001-04617-000. Gunderman examined the Trust's tax receipts and agreed that they showed payments made on 32.76 acres for that entire period of time.

On appeal, the Trust argues that MVC cannot satisfy the requirements of section 18-11-106(a)(1) because the Trust consistently paid taxes on the disputed parcel between at least 2011 and 2020. It also asserts that the evidence did not demonstrate that MVC's tax

11

payments went toward the taxes on the land belonging to the Trust. It further points out that if Conway County had shifted the disputed parcel to MVC's account for payment, there should have been a corresponding reduction in the acreage of the property listed on the Trust's receipts and records with the tax assessor's office.

The Trust's argument, however, is premised solely on section 18-11-106(a)(1). Section 18-11-106(a)(2), which is separated from subsection (a)(1) by the disjunctive "or," provides an alternative means of satisfying the statutory elements. Under this subsection, the person claiming real property by adverse possession must have actual or constructive possession of the real property being claimed and have "[h]eld color of title to real property contiguous to the real property being claimed by adverse possession for a period of at least seven (7) years and during that time paid ad valorem taxes on the contiguous real property to which the person has color of title."

It is undisputed that MVC's 1.19 acres was contiguous to the real property being claimed by adverse possession and that MVC paid ad valorem taxes on the property. The only remaining factor that MVC must satisfy is that it held "color of title" to the contiguous real property.

"Color of title" "generally connotes an instrument which by apt words of transfer passes what purports to be a title but which is defective in form." *Tolson v. Dunn*, 48 Ark. App. 219, 224, 893 S.W.2d 354, 356 (1995). It is "not, in law, title at all. It is a void paper, having the semblance of a muniment of title, to which, for certain purposes, the law

12

attributes certain qualities of title." *Dodson v. Lovelace*, 2016 Ark. App. 265, at 6, 493 S.W.3d 353, 356–57.

The use of the phrase "color of title" in section 18-11-106(a)(2) is therefore incongruous and puzzling. It appears to give greater import or weight to a document that does not actually pass title than to a document that *does.* It has been suggested that the 1995 amendment to our adverse-possession statute "confused 'color of title' with 'title' and . . . ideally should read 'title or color of title.'" Lynn Foster, *Adverse Possession and Boundary by Acquiescence in Arkansas: Some Suggestions for Reform*, 33 U. Ark. Little Rock L. Rev. 199, 247 (2011).

Our rules of statutory construction require us to reject an interpretation of a statute that results in absurdity or injustice, leads to contradiction, or defeats the plain purpose of the law. *Weiss v. Cent. Flying Serv., Inc.*, 326 Ark. 685, 690, 934 S.W.2d 211, 214 (1996). To interpret section 18-11-106(a)(2) to elevate *color of title* over *actual title* would lead to an absurdity since it would require "color of title" to prevail over actual title for purposes of this statute. It would allow someone who did not actually have title to a tract of land to adversely claim contiguous property while preventing the same by someone with actual title. This surely was not what was intended by the statute. We therefore conclude that the better interpretation of the statute is that which Professor Foster suggests. *See also Roberts v. Boyd*, 94 Ark. App. 345, 349, 230 S.W.3d 301, 304 (2006) (stating that section 18-11-106(a)(2) "requires only that the real property *owned* by the party claiming adverse possession be contiguous to the property claimed by adverse possession." (emphasis added)). Thus, because

MVC held title to real property contiguous to the real property being claimed and paid ad valorem taxes on that contiguous property for at least seven years, the circuit court correctly found that MVC had established the statutory elements of adverse possession under section 18-60-106(a)(2).

## C. Common-Law Elements of Adverse Possession

Finally, the Trust argues that the circuit court erred in finding that all the common-law elements of adverse possession had been met. To prove the common-law elements of adverse possession, a claimant must show that he has possessed the contested property continuously for seven years and that the possession has been actual, open, notorious, continuous, hostile, and exclusive, and it must be accompanied with an intent to hold against the true owner. *Thompson v. Fischer*, 364 Ark. 380, 384, 220 S.W.3d 622, 625 (2005); *Collier v. Gilmore*, 2018 Ark. App. 549, 562 S.W.3d 895. The proof required as to the extent of possession and dominion may vary according to the location and character of the land. *Walker v. Hubbard*, 31 Ark. App. 43, 787 S.W.2d 251 (1990). It is ordinarily sufficient that the acts of ownership are of such a nature as one would exercise over his or her own property and would not exercise over that of another. *Sutton v. Gardner*, 2011 Ark. App. 737, 387 S.W.3d 185. Whether possession is adverse to the true owner is a question of fact. *Hicks v. Flanagan*, 30 Ark. App. 53, 782 S.W.2d 587 (1990).

In order to determine whether MVC established the common-law elements of adverse possession, we turn to the testimony presented at trial regarding the nature of the use of the land. Magie testified that MVC bought the subject property from the Herods in November

14

2014. He stated that since purchasing the property, he had kept it clean, cut limbs, run off squatters, and "maintain[ed] the property to the way it was whenever I purchased it." In addition, he testified that he had hired someone to mow the property once or twice a year since he bought it and introduced photographs showing the maintained and mowed property. He also soil tested the property with an eye toward building a veterinary clinic on the land.

Magie explained that both Parcel A and Parcel B were enclosed by a fence along Highway 9 and by remnants of an old fence along Blue Diamond Drive. Parcel A's east border was Parcel B's west border, but there was nothing, such as a fence, dividing the two. Access to Parcel A was through a gate located on Parcel B. Magie said it was that way when he bought it, and that was how he continued to maintain it. He said he had never hidden anything, and anyone driving by could see that the property was being kept up. He added that he had taken phone calls from people who obviously thought he was the owner, that he was behaving in such a manner that would reasonably put the Bartoni Trust on notice that he was asserting ownership of the property, and that he had never asked permission to do anything--all since 2014.

Magie became aware that there could be an issue with the title to the property in late 2015 or early 2016, but he continued to operate the same way regarding the property even after that. No one but him had done anything to the property since 2014. To get onto Parcel A, a person with a mower or vehicle would have to come across Parcel B, and Magie had seen no evidence of anybody ever being there or doing anything on the property. No one

15

had ever told him he was not supposed to be there or tried to run him off the property. He said that when he purchased the property, he thought it was his, and it was his intention to hold it against the actual owner.

Magie said that he had run squatters off of the property––he had seen them and had found potty chairs and beer cans, and he told them to leave. He had met Bartoni's cousin, Gene Ruffiner, who leased the thirty-acre parcel to the south, but he had never seen Ruffiner on the disputed property. Ruffiner was aware that Magie had been taking care of the property, or at least Magie assumed he was, just as it had been maintained by the previous owners.

Edward Ruff, who owned the business just east or northeast of the disputed property, testified that he drove by the property regularly and could tell that it had been maintained. Ruff was aware that Magie owned it, and years ago he had seen Robert Bour, whom he knew to be the previous owner, on the property. He had never, however, seen Gene Ruffiner or anybody else from the Trust on the property.

After calling Gunderson and Cain to testify about the assessment of the property and the taxes paid thereon, MVC next called Ruffiner. As mentioned above, Ruffiner is Bartoni's cousin and leased the property from the Trust, but he was not a beneficiary of the Trust. He agreed that he could see both Parcel A and Parcel B from his side of the highway and could see that it had been mowed and kept up. He acknowledged that the only way he could get to Parcel A was by driving across MVC's property, although he had not driven a vehicle onto it since the lawsuit had started. He never told Magie that he was trespassing on the property

16

and had never done anything to oust him from it. Ruffiner claimed that he had planted pine trees on Parcel A for pulpwood but admitted that he had not cut any trees since 2014.

On cross-examination, Ruffiner explained that he could see and hear activity on Parcel A from his house, which was situated across Highway 9 from Parcels A and B. He said he had seen Magie on Parcel A "right after he bought it" in November 2014. Ruffiner said that Magie was asking to buy the triangle because he wanted to build a veterinary clinic on both pieces of property. He admitted he had seen some people who worked for Magie mowing the property; he said he had gone over and told them that they were getting over the boundary but did not tell them to leave. He gave advice to another person he saw mowing the property about how to best do it and told him to just stay clear of the trees. Ruffiner said that he and Robert Bour, who was also one of Bartoni's cousins, had planted those trees.

Turning to the Trust's argument on appeal, it challenges the circuit court's findings regarding most, but not all, of the common-law elements of adverse possession.[6] The Trust first argues that MVC did not exclusively possess the land. Here, it asserts that Ruffiner lives on Trust land, can look out his window at the disputed property, and can walk across the road to be on the land. Without citing authority in support of its argument, the Trust claims that Ruffiner was essentially a co-tenant with MVC, and that if MVC wanted to meet the exclusivity element, it needed to evict Ruffiner.

---

[6]The Trust does not challenge the "continuous" element or the requirement that the claimant possess the property with the intent to hold against the true owner.

The Trust failed to raise this "co-tenant" argument before the circuit court, however, raising it instead for the first time on appeal. A party is bound by the scope of his or her arguments made to the circuit court, and we will not address arguments raised for the first time on appeal. *Wakefield v. Bell*, 2018 Ark. App. 120, 542 S.W.3d 908; *Sills v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 9, 538 S.W.3d 249.

The Trust also claims that MVC's use of the land was not exclusive because other people used the land. Here, it cites Ruffiner's testimony that he had given hunters permission to be on the land, as well as Magie's testimony that unknown persons had left beer cans and other detritus on the property. The general rule, however, is that "[o]ne may be in possession, for the purpose of acquiring land under the statutes of limitation, although he permits the public to pass over the land . . . or not withstanding occasional trespasses by others made without intent to oust the claimant or assert a hostile claim against him[.]" *England v. Eaton*, 102 Ark. App. 154, at 156–57, 283 S.W.3d 228, 230 (quoting 4 *Tiffany on Real Property* § 1141, 736 (3d ed. 1975)). Here, the court had before it testimony that hunters were there only as permitted, and there was no evidence that any of the individuals who passed over the land for hunting or squatting possessed the intent to "oust" MVC or assert a hostile claim against it.

The Trust next claims that MVC failed to prove that its use was open and notorious. Essentially, it asserts that Ruffiner testified he never saw Magie on the property, other than shortly after he bought it; therefore, MVC failed to "put the world on notice" that it was claiming the property. Magie, however, testified that he had maintained a fence around the

18

entire property that encompassed Parcel A and Parcel B, and the only way to access Parcel A was through a gate, which he tried to keep locked at all times, on Parcel B. This court has held that fencing the disputed area is an act of ownership evidencing adverse possession, and the fact that the fence may be degraded does not necessarily mean that the area is no longer "enclosed"; the question is whether the enclosure is sufficient to "fly the flag" over the land and give notice to the true owner that the land is being adversely claimed. *Steele v. Blankenship*, 2010 Ark. App. 86, at 13, 377 S.W.3d 293, 300. Ruffiner acknowledged that the only way to access both properties was through the gate on Parcel B. Moreover, there was testimony before the court that Parcel A was visible from the road and that it was apparent that the property had been mowed and maintained. We therefore cannot conclude that the court erred in finding MVC's use was open and notorious.

The Trust further challenges the court's finding that MVC actually possessed the land, arguing that the only evidence of this element was that someone mowed the property once or twice a year. It is true that this court has held that the mere mowing of property is not sufficient notice of a hostile claim to the property. *Boyd*, 98 Ark. App. at 391, 255 S.W.3d at 899. It is ordinarily sufficient, however, that the acts of ownership are of such a nature as one would exercise over his own property and would not exercise over that of another and that the acts amount to such dominion over the land as to which it is reasonably adapted. *Stevens*, 2024 Ark. App. 295, at 8–9, 689 S.W.3d at 701. Notice of adverse possession may be inferred from facts and circumstances, such as grazing livestock, erection of a fence, or

19

improving the land. *Black v. Clary*, 235 Ark. 1001, 363 S.W.2d 528 (1963); *McLaughlin v. Sicard*, 63 Ark. App. 212, 977 S.W.2d 1 (1998).

Here, the circuit court found that Magie had not only kept the property mowed, but he had also kept both tracts clean, run squatters off the property, taken soil samples, given permission to hunters who asked for permission to hunt on the property, and maintained the fence and gate around the property. This behavior is consistent with that which a person would exercise over his own property and would not exercise over property belonging to another.

Finally, the Trust argues that MVC failed to show that its use of the property was hostile because it employed other people to mow and bushhog the land. The Trust cites no authority in support of this position. This court has held, however, that when a landowner takes possession of land under the belief that he or she owns it, encloses it, and holds it continuously for the statutory period under claim of ownership without recognition of the possible right of another on account of mistake, such possession is adverse and hostile to the true owner. *O'Neal v. Love*, 2020 Ark. App. 40, at 4, 593 S.W.3d 39, 42; *Smith v. Boatman*, 2017 Ark. App. 488, at 6, 529 S.W.3d 254, 258. We conclude that the testimony cited above as supporting the previous factors also serves to satisfy the hostility element.

Whether possession is adverse to the true owner is a question of fact. *O'Neal*, *supra*. The circuit court here, after assessing the testimony and the credibility of the witnesses, found that MVC satisfied each of the elements necessary to establish adverse possession. On

20

our de novo review of the record, we are unable to say that the circuit court was clearly erroneous. We therefore affirm.

Affirmed.

GLADWIN and WOOD, JJ., agree.

*The Cambiano Law Firm, PLLC*, by: *Janina Cambiano*, for appellant.

*Landon T. Sanders*, for appellee.